# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ET AL.,* *EX REL.* PATRICK CARPENTER, <br><br> Plaintiffs, <br><br> -v.- <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | Civil No.:  07-CV-10918 (RGS) <br><br> The Honorable Richard G. Stearns <br><br> ORAL ARGUMENT REQUESTED |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Peter E. Gelhaar (BBO# 188310)
Michael S. D'Orsi (BBO# 566960)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street
33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
(617) 720-3554 – Fax
peg@dcglaw.com
msd@dcglaw.com

James F. Hurst (admitted *pro hac vice*)
Thomas J. Frederick (admitted *pro hac vice*)
Kathleen B. Barry (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
(312) 558-5700 – Fax
jhurst@winston.com
tfrederick@winston.com
kbarry@winston.com

John W. Moss (admitted *pro hac vice*)
WINSTON & STRAWN LLP
1700 K Street N.W.
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 – Fax
jwmoss@winston.com

*Attorneys for Defendant Abbott Laboratories, Inc., incorrectly named as Abbott Laboratories*
Dated: November 13, 2009

# TABLE OF CONTENTS

                                                                                        **Page**

I.      INTRODUCTION ................................................................................................ ii

II.     BACKGROUND, COMPLAINT ALLEGATIONS, AND PUBLIC RECORD
        INFORMATION.................................................................................................4

        A.   Background .............................................................................................4

        B.   Complaint Allegations ...........................................................................5

             1.    Kaletra..........................................................................................6

             2.    Off-Label Marketing Theory ........................................................8

             3.    Kickback Theory...........................................................................9

        C.   Public Record Information Recognizing the Importance of Off-Label Use in
             HIV/AIDS Treatment............................................................................10

III.    ARGUMENT ...................................................................................................12

        A.   Carpenter's Amended Complaint Fails to Allege Violations of the FCA with
             Particularity..........................................................................................13

             1.    Carpenter Fails to Plead How Abbott Caused the Submission of False
                   Claims with Particularity ............................................................14

             2.    Carpenter Fails to Plead a Kickback Scheme with Particularity ...................17

             3.    Carpenter Fails to Allege Claims for Reimbursement of Off-Label
                   Prescriptions with Particularity...................................................19

             4.    Carpenter Fails to Allege Claims for Reimbursement Tainted by
                   Kickbacks with Particularity........................................................19

             5.    Carpenter Fails to Allege Claims Under State False Claims Acts with
                   Particularity.................................................................................20

        B.   Carpenter Cannot Allege Medicaid False Claims in Massachusetts as a
             Matter of Law ......................................................................................21

        C.   Carpenter's Claims Are Implausible, Requiring Dismissal of the Complaint..........22

IV.     CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008).....................................................................................12

*Allison Engine Co. v. United States ex rel. Sanders*,
   ___ U.S. ___, 128 S. Ct. 2123 (2008)......................................................................5

*Ashcroft v. Iqbal*,
   ___ U.S. ___, 129 S. Ct. 1937 (2009)........................................................12, 18, 25

*Automated Salvage v. Wheelabrator Envtl. Sys.*,
   155 F.3d 59 (2d Cir. 1998).......................................................................................10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................12, 21, 22, 25

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001).................................................................................................11

*Coyne v. City of Somerville*,
   972 F.2d 440 (1st Cir. 1992)....................................................................................12

*Dormeyer v. Comerica Bank - Illinois*,
   No. 96-C-4805, 1997 WL 403697 (N.D. Ill. July 15, 1997) ...................................13

*Gates v. Fordice*,
   No. 4:90-CV-125, 1999 WL 33537206 (N.D. Miss. July 19, 1999) .......................12

*Harrison v. Westinghouse Savannah River Co.*,
   176 F.3d 776 (4th Cir. 1999) ...................................................................................19

*In re Colonial Mortgage Bankers Corp.*,
   324 F.3d 12 (1st Cir. 2003)......................................................................................10

*In re Neurontin Mktg. and Sale Practices Litig.*,
   244 F.R.D. 89 (D. Mass. 2007).................................................................................24

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   491 F. Supp. 2d 12 (D. Mass. 2007) ...................................................................16, 19

*In re Pharma. Indus. Average Wholesale Price Litig.*,
   538 F. Supp. 2d 367 (D. Mass. 2008) ......................................................................14

*In re Zyprexa Prod. Liab. Litig.*,
   549 F. Supp. 2d 496 (E.D.N.Y. 2008) ......................................................................25

*Metropolitan Life Ins. Co. v. Drainville*,
No. 07-427, 2009 WL 1209473 (D. R.I. May 4, 2009) ..........................................................13

*Mikes v. Straus*,
274 F.3d 687 (2d Cir. 2001)..............................................................................................20

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007)............................................................................................................4

*Shaw v. AAA Eng'g & Drafting, Inc.*,
213 F.3d 519 (10th Cir. 2000) ..........................................................................................19

*United States ex rel. Atkins v. McInteer*,
470 F.3d 1350 (11th Cir. 2006) ........................................................................................25

*United States ex rel Bain v. Georgia Gulf Corp.*,
208 Fed. Appx. 280 (5th Cir. 2006)....................................................................................4

*United States ex rel. Carter v. Halliburton Co.*,
No. 1:08CV1162, 2009 WL 2240331 (E.D. Va. July 23, 2009) .......................................19

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
290 F.3d 1301 (11th Cir. 2002) ........................................................................................25

*United States ex rel. Deering v. Physiotherapy Assoc.*,
601 F. Supp. 2d 368 (D. Mass. 2009) ...............................................................................21

*United States ex rel. Duxbury v. Ortho Biotech Prods.*,
579 F.3d 13 (1st Cir. 2009)................................................................................4, 20, 24

*United States ex rel. Franklin v. Parke-Davis*,
147 F. Supp. 2d 39 (D. Mass. 2001) ....................................................................16, 22, 24

*United States ex rel. Gagne v. City of Worcester*,
565 F.3d 40 (1st Cir. 2009).................................................................................... *passim*

*United States ex rel. Hess v. Sanofi-Synthelabo, Inc.*,
No. 4:05CV570, 2006 WL 1064127 (E.D. Mo. Apr. 21, 2006)....................................14, 23

*United States ex rel. Hopper v. Anton*,
91 F.3d 1261 (9th Cir. 1996) ............................................................................................19

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
360 F.3d 220 (1st Cir. 2004)............................................................................ 14, 19-20, 25

*United States ex rel. Lacy v. New Horizons, Inc.*,
No. 08-6248, 2009 WL 3241299 (10th Cir. Oct. 9, 2009) ...................................................5

iii

*United States ex rel. Piacentile v. Wolk,*
  No. 93-5773, 1995 WL 20833 (E.D. Pa. Jan.17, 1995)........................................................16

*United States ex rel. Polansky v. Pfizer, Inc.,*
  No. 04-CV-704, 2009 WL 1456582 (E.D.N.Y. May 22, 2009) ...............................................22

*United States ex rel. Poteet v. Lenke,*
  604 F. Supp. 2d 313 (D. Mass. 2009) ........................................................12, 16, 19

*United States ex rel. Rost v. Pfizer, Inc.,*
  253 F.R.D. 11 (D. Mass. 2008)................................................................ *passim*

*United States ex rel. Rost v. Pfizer, Inc.,*
  507 F.3d 720 (1st Cir. 2007)............................................................................3, 20

*United States ex rel. Walsh v. Eastman Kodak Co.,*
  98 F. Supp. 2d 141 (D. Mass. 2000) ........................................................................13

*United States ex rel. Willard v. Humana Health Plan of Texas Inc.,*
  336 F.3d 375 (5th Cir. 2003) ....................................................................................19

*United States v. First Nat'l Bank of Cicero,*
  957 F.2d 1362 (7th Cir. 1992) ..................................................................................23

*United States v. Jain,*
  93 F.3d 436 (8th Cir. 1996) ......................................................................................17

*United States v. Lizardo,*
  445 F.3d 73 (1st Cir. 2006)........................................................................................17

*Watterson v. Page,*
  987 F.2d 1 (1st Cir. 1993) .........................................................................................10

**FEDERAL STATUTES**

28 U.S.C. § 1367 ...........................................................................................................21

31 U.S.C. § 3729............................................................................................................1, 5, 19

31 U.S.C. § 3730............................................................................................................4

42 U.S.C. § 1320a-7b .....................................................................................................17

42 U.S.C. § 1396r-8 .......................................................................................3, 11, 22

Pub. L. No. 111-21, 123 Stat. 1617 (May 20, 2009) ....................................................5

STATE: STATUTES

MASS. GEN. LAWS ANN. ch. 175 §§ 47O, 47P ....................................................3, 22

Massachusetts False Claims Act,
    MASS. GEN. LAWS ANN. ch. 12, § 5B ...................................................................21

FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 9 ................................................................................................ *passim*

Fed. R. Civ. P. 10 .......................................................................................................13

Fed. R. Civ. P. 12 ................................................................................................. 12-13

FEDERAL REGULATIONS

42 C.F.R. § 1001.952(d) ............................................................................................18

68 Fed. Reg. 23,731 (May 5, 2003) ...........................................................................18

74 Fed. Reg. 1694 (Jan. 13, 2009) ...................................................................... 11-12

OTHER AUTHORITIES

JOHN T. BOESE, 2 CIVIL FALSE CLAIMS AND *QUI TAM* ACTIONS § 6.01 ...........................................6

Robert J. Buchanan, *Medicaid Managed Care and Coverage of Prescription
    Medications*, 92 AM. J. PUBLIC HEALTH 1238 (2002) ............................................23

Food and Drug Admin., Guidance for Industry - Good Reprint Practices for the
    Distribution of Medical Journal Articles and Medical or Scientific Reference
    Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared
    Medical Devices......................................................................................................11

Scott Gottlieb, Food and Drug Admin. Deputy Comm'r for Med. and Sci. Affairs,
    Remarks at Windhover's FDA/CMS Summit, Washington, D.C. (Dec. 5, 2006) .................11

H.R. Rep. No. 1167, 96th Cong., 2d Sess. 59 (1980), *reprinted in* 1980 U.S.C.CA.N.
    5526........................................................................................................................16

MASS. DEP'T OF HEALTH CARE FIN. AND POLICY, COMPREHENSIVE REVIEW OF
    MANDATED BENEFITS IN MASSACHUSETTS:  REPORT TO THE LEGISLATURE (2008) ......2, 11, 23

MASSHEALTH, MASS. EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVS., THE
    MASSHEALTH DRUG LIST (2009) .................................................................3, 4, 22

OFFICE OF AIDS RESEARCH ADVISORY COUNCIL, U.S. DEP'T OF HEALTH AND HUMAN
SERVS., GUIDELINES FOR THE USE OF ANTIRETROVIRAL AGENTS IN HIV-1-
INFECTED ADULTS AND ADOLESCENTS (2008) ........................................................ 2, 11-12, 23

Virginia Medicaid Provider Manual ............................................................................................22

## I.    INTRODUCTION

In this *qui tam* action brought under federal and various state false claims acts,[1] Relator Patrick Carpenter ("Carpenter") alleges that Defendant Abbott Laboratories, Inc. ("Abbott") illegally marketed its signature HIV/AIDS drug, Kaletra, causing doctors and other health care providers to submit false claims for reimbursement from government-run health care programs, including Medicare and Medicaid.  Carpenter alleges that Abbott did this, first, by improperly promoting Kaletra for uses not approved by the FDA ("off-label" uses) and, second, by paying kickbacks to doctors to prescribe Kaletra off-label.

Abbott asks this Court to consider the unconvincing and conclusory allegations in the amended complaint and dismiss this case.  While the deficiencies in the amended complaint are clear (as will be discussed below), the context in which these allegations are made is critical to understand.  Carpenter seeks to impose punitive liability on Abbott for:

- The "off-label" sales of an HIV/AIDS drug to HIV/AIDS health care providers for the treatment of HIV/AIDS infections; and

- The inducement of reimbursement for off-label prescriptions under Medicaid laws that allow reimbursement of off-label prescriptions of HIV/AIDS drugs.

Carpenter makes these conclusory allegations, without any specific facts showing causation and without acknowledging the accepted medical standard of care that includes off-label uses of drugs he presumably knows as a pharmacist.  As stated in a recent Massachusetts-commissioned report, off-label prescriptions of HIV/AIDS drugs are "an integral part of the community standard of care to treat AIDS and/or prevent HIV-related opportunistic infections."  MASS.

---

[1]    References in this motion to the complaint are to Plaintiff's Amended Complaint Pursuant to the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and Pendent State False Claims Acts  (the "amended complaint" or "Am. Compl.").

DEP'T OF HEALTH CARE FIN. AND POLICY, COMPREHENSIVE REVIEW OF MANDATED BENEFITS IN MASSACHUSETTS: REPORT TO THE LEGISLATURE 27 (2008) ("Massachusetts Legislative Report").[2]  The U.S. Department of Health and Human Services ("DHHS") has acknowledged the important role of off-label prescriptions by noting that its guidelines for the treatment of HIV/AIDS "may not represent FDA approval or approved labeling for the particular products or indications in question."  OFFICE OF AIDS RESEARCH ADVISORY COUNCIL, U.S. DEP'T OF HEALTH AND HUMAN SERVS., GUIDELINES FOR THE USE OF ANTIRETROVIRAL AGENTS IN HIV-1-INFECTED ADULTS AND ADOLESCENTS 123 (2008) ("DHHS Guidelines").[3]

To state a claim under the False Claims Act, with all of its attendant penalties and sanctions, Carpenter must do more than just presume that unidentified off-label sales of Abbott drugs resulted from undescribed off-label promotional efforts or kickbacks.  Given that Abbott's Kaletra was the most popular AIDS drug, (Am. Compl. ¶ 66), its off-label use would be expected under the accepted community standard of care.  Without sufficient, credible allegations that such off-label use was caused by Abbott's conduct, Carpenter's amended complaint simply fails to state a claim.

Aside from the implausibility of Carpenter's claims, his amended complaint fails to satisfy the particularity requirements of Fed. R. Civ. P. 9(b).  Most notably, it fails to link Abbott's allegedly wrongful conduct to the submission by specific doctors of specific false claims for government reimbursement.  "FCA liability does not attach to violations of federal law or regulations, such as marketing of drugs in violation of the FDCA, that are independent of any false claim" because "[e]vidence of an actual false claim is 'the *sine qua non* of a False

---

[2]     http://www.mass.gov/Eeohhs2/docs/dhcfp/r/pubs/mandates/comp_rev_mand_benefits.pdf.
[3]     http://www.aidsinfo.nih.gov/ContentFiles/AdultandAdolescentGL.pdf.

Claims Act violation.'" *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 727 (1st Cir. 2007) (internal citations and quotations omitted) (*Rost I*). Thus, Carpenter must allege with particularity how Abbott allegedly "caused" the submission of "false claims" by providers. *United States ex rel. Rost v. Pfizer, Inc.*, 253 F.R.D. 11, 17 (D. Mass. 2008) (*Rost II*). Here, while Carpenter's amended complaint insinuates that Abbott's conduct somehow led to the filing of false claims, it alleges no specifics concerning how this occurred – in other words, the necessary "who, what, when, where, and how" explaining the connection between Abbott's alleged conduct and the filing of alleged false claims is missing. *United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 46-47 (1st Cir. 2009).

Likewise missing from Carpenter's amended complaint are additional necessary particulars. These include allegations that Abbott knowingly and willingly made payments to doctors for the purpose of inducing them to prescribe Kaletra; details concerning the false claims allegedly submitted; and what alleged false statements were made to obtain government reimbursement. For these reasons as well, the amended complaint must be dismissed.

Finally, even assuming they were pled with sufficient particularity, Carpenter's allegations relating to Medicaid claims purportedly reimbursed by the Commonwealth of Massachusetts fail to state a claim as a matter of law. The federal Medicaid program permits states that cover drugs to reimburse claims for off-label uses. *See* 42 U.S.C. § 1396r-8(d)(1)(B)(i). Massachusetts' law *requires* insurers to reimburse off-label uses of HIV/AIDS drugs like Kaletra if they are recognized as effective treatments "in the medical literature." MASS. GEN. LAWS ANN. ch 175 §§ 47O, 47P. The MassHealth Drug List, which governs reimbursement under Massachusetts Medicaid program, lists Kaletra among the HIV/AIDS prescription drugs for which it will reimburse without prior authorization and without reference

to whether the prescription is for off-label use. *See* MASS. EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVS., THE MASSHEALTH DRUG LIST 121 (2009) ("MassHealth Drug List").[4]  Thus, Massachusetts has made a specific public health policy decision to *require* insurers to reimburse claims submitted for the very same alleged off-label uses of Kaletra Carpenter cites in his amended complaint.  For this reason, these claims cannot form the basis for a false claims action.

Accordingly, Abbott respectfully requests that the Court dismiss the amended complaint with prejudice.[5]

## II.    BACKGROUND, COMPLAINT ALLEGATIONS, AND PUBLIC RECORD INFORMATION

### A.    Background

The relator, Patrick Carpenter, is a pharmacist by training and was employed as an Abbott Clinical Science Manager for six months between April and November 2006.  Am. Compl. ¶¶ 24-25.  This is a common industry position, in which Carpenter's responsibilities included working with sales representatives and meeting with physicians on scientific issues.  *Id.* ¶ 25.

---

[4]    http://www.mass.gov/Eeohhs2/docs/masshealth/pharmacy/mh_druglist.pdf.

[5]    Several of relator's allegations in his amended complaint, including those related to the alleged false claims, are based on information that occurred long after he finished his six-month stint at Abbott in November 2006.  *See, e.g.,* Am. Compl. ¶¶ 4, 25, 189, 195.  This suggests that relator did not have "direct and independent" knowledge of this alleged conduct, and that this information may have been based upon a public disclosure.  *See* 31 U.S.C. § 3730(e)(4).  Public disclosure would deprive the court of jurisdiction over the portion of relator's claims based on allegations for which relator lacks direct and independent knowledge.  *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 476 (2007).  For each set of publicly disclosed factual allegations, relator must prove that he is the original source of the allegations in his amended complaint, and that he provided this information to the government before he filed his amended complaint.  *See United States ex rel. Duxbury v. Ortho Biotech Prods.*, 579 F.3d 13, 28 (1st Cir. 2009) (affirming holding that one relator was not an "original source"); *United States ex rel Bain v. Georgia Gulf Corp.*, 208 Fed. Appx. 280, 282 (5th Cir. 2006) (same). If there has been public disclosure then at a minimum, Carpenter must meet his burden of establishing that he has direct and independent knowledge of his post-employment allegations.direct and independent knowledge of his post-employment allegations.

Carpenter filed his original complaint under seal on May 15, 2007.  The Court unsealed this original complaint on April 27, 2009, and Carpenter filed an amended complaint on August 20, 2009.  To date, neither the United States nor any state has elected to intervene.

### B.    Complaint Allegations

In his single-count amended complaint, Carpenter alleges that Abbott violated Section 3729(a)(1) and (2) of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1) and (2), as well as 13 state false claims acts.

To plead a section 3729(a)(1) violation, the amended complaint must allege facts showing that:  (1) the defendant presented, or caused another person to present, a "claim for payment or approval" to the United States, (2) the claim was "false or fraudulent," and the person acted knowing that the claim was false.  31 U.S.C. § 3729(a)(1).  A section 3729(a)(1) claim requires direct presentment of a false claim to the federal government.  *See, e.g., Gagne*, 565 F.3d at 46 n.7 (recognizing that cases under subsection (a)(1) expressly include a presentment requirement).

To plead a section 3729(a)(2) claim, direct presentment of the false claim to the government is not required, but the plaintiff must show "that the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'"  *Allison Engine Co. v. United States ex rel. Sanders*, ___ U.S. ___, 128 S. Ct. 2123, 2130 (2008).[6]  The state false claims acts at issue are generally modeled on these federal

---

[6]        After the *Allison Engine* decision, Congress enacted the Fraud Enforcement and Recovery Act of 2009 ("FERA"), which amended Section 3729(a)(2) of the FCA to eliminate *Allison Engine*'s intent requirement for violation of this provision.  *See* 31 U.S.C. § 3729(a)(1)(B) (recodifying former 31 U.S.C. § 3729(a)(2)).  However, because this action was filed prior to the amendment, and involves claims  prior to June 7, 2008, the amendments do not govern this action, as Carpenter recognizes by having pled his claim under the prior version of the statute.  *See* Pub. L. No. 111-21, 123 Stat. 1617, 1625 (May 20, 2009).  Thus, we refer to the pre-FERA version of Section 3729(a)(2), which governs this action.  *See, e.g., United States ex rel. Lacy v. New Horizons, Inc.*, No. 08-6248, 2009 WL 3241299, at *2 n.2 (10th Cir. Oct. 9, 2009).

provisions. *See, e.g.,* JOHN T. BOESE, 2 CIVIL FALSE CLAIMS AND *QUI TAM* ACTIONS § 6.01 (noting that since 1986, "many states," including all twelve states and the District of Columbia cited in Carpenter's amended complaint, "have passed legislation specifically modeled on the federal civil False Claims Act").

Specifically, Carpenter alleges that Abbott "has caused the submission of false claims to the Federal and State Governments and made, used, or caused to be made, false records or statements to get false or fraudulent claims to be paid by the Federal and State Governments" (Am. Compl. ¶ 7) in violation of these FCA provisions in two ways:

(1)    By improperly promoting Kaletra for uses that were inconsistent with the label's recommendations on use with other drugs ("combination therapy") and dosing.

(2)    By providing unlawful kickbacks to providers to increase prescriptions of Kaletra.

*See, e.g., id.* ¶¶ 4-5.  Carpenter theorizes this alleged conduct caused providers, pharmacies and/or others to submit reimbursement claims to Medicare, Medicaid, and other government-funded programs to pay for Kaletra prescriptions that these entities should not have reimbursed. *See id.* ¶¶ 41, 237 (alleging that the programs had no "knowledge as to the falsity").

Carpenter's allegations relating to each of these theories are summarized in more detail below, after a review of the allegations relating to the FDA-approved uses of Kaletra.

**1.    Kaletra**

As set forth in the amended complaint, Kaletra is the brand name for an HIV/AIDS drug product that is part of a class of drugs known as antiretroviral therapy drugs (or ARVs) approved to treat HIV/AIDS, and is in a sub-category of drugs within that class known as protease inhibitors (or PIs). *Id.* ¶ 1.  Kaletra is "co-formulated," meaning that Kaletra tablets contain two separate drugs, generically known as lopinavir and ritonavir. *Id.*

6

### a.     FDA Approval

The FDA approved Kaletra in 2000 in a soft gel capsule formulation for twice-daily use. *Id.* ¶¶ 1-2.  In 2005, the FDA approved once-daily use of Kaletra in certain patients and a new tablet formulation.  *Id.*  As of early 2006, Kaletra had been identified as the only "preferred" PI drug by the Department of Health and Human Services (*id.* ¶¶ 58, 70) due to its demonstrated potency and effectiveness over the course of many years.

### b.     Dosing

According to the amended complaint, Abbott's FDA-approved labeling described two dosing options in 2005 for the new Kaletra tablets:  (1) two tablets twice-daily (sometimes referred to as "BID" dosing); or (2) four tablets once-daily (sometimes referred to as "QD" dosing).  *Id.* ¶ 2, 76, 82.  The amended complaint alleges that Abbott's FDA-approved labeling told doctors that the once-daily dosing regimen was intended for "treatment-naïve" patients, *i.e.*, those who had not previously used any ARV drugs for a significant period.  *Id.* ¶¶ 2-3, 76, 82. Likewise, the amended complaint alleges that Abbott's labeling told doctors that they should prescribe twice-daily dosing for "treatment-experienced" patients who had previously received other ARV drugs.  *Id.*

Some providers start new patients on combination regimens that do not include a PI drug like Kaletra. *Id.* ¶ 58.  These patients are commonly referred to as "PI-naïve" rather than "treatment-naïve," to accurately reflect that they have received prior ARV drugs, but have never taken a PI drug like Kaletra. *Id.* ¶ 76.  Therefore, these patients are both "PI-naïve" (they've never taken a PI drug) and "treatment-experienced" (they've taken non-PI ARV drugs).

### c.     Combination Therapy and Monotherapy

According to the amended complaint, Abbott's FDA-approved labeling also told providers that, regardless of the dosing option elected, Kaletra was intended to be used in

combination with other ARVs in what is typically a three-drug regimen. *Id.* ¶¶ 82, 116. Typically, providers prescribe at least two other non-PI class ARV drugs with Kaletra (the two most common non-PI classes of drugs are referred to as "NRTIs" and "NNRTIs"). "Monotherapy" simply refers to prescribing a one-drug regimen, rather than the more common three-drug regimen.

### 2. Off-Label Marketing Theory

With respect to his off-label marketing theory, Carpenter alleges that from early 2006 until approximately mid-2008, Abbott "illegally marketed and promoted Kaletra once-daily for use by patients who were therapy-experienced, contrary to Kaletra's FDA indications." *Id*. ¶ 4.[7] Carpenter also alleges that Abbott promoted Kaletra for "monotherapy." *Id.* There is no allegation that Kaletra was promoted or prescribed to treat any disease other than HIV/AIDS, the disease for which the FDA approved the use of Kaletra.

In support of his charge that Abbott engaged in an off-label promotion scheme, Carpenter alleges that Abbott made a variety of material misstatements and omissions that were directed toward promoting Kaletra for once-daily use in treatment-experienced patients and as a monotherapy drug, contrary to its FDA indications. *See generally id.* ¶¶ 4, 85, 97-8, 104. However, Carpenter does *not* allege: (1) *to whom* any alleged material misstatements of fact were made; or (2) on *which* Kaletra sales calls allegedly misleading presentations were purportedly used. *See, e.g., id.* ¶ 98.

Instead, following a critical review of the substance of various statements, Carpenter generally alleges that "Abbott marketed Kaletra off-label" to certain "targeted" Boston physicians "who subsequently wrote off-label prescriptions," which, based on Carpenter's

"belief," were later "reimbursed by the government, as opposed to a private payor." *Id.* ¶¶ 178-79. Carpenter alleges no specific facts concerning what happened during particular sales calls, only that certain doctors were "called on repeatedly regarding Kaletra by Abbott sales representatives during the relevant time period," including Drs. Robbins (*id.* ¶ 193); Fuller (*id.* ¶ 199); Yawetz (*id.* ¶ 205); and Kogelman (*id.* ¶ 210). Carpenter does not plead that he personally witnessed any particular Abbott representative engaging in off-label promotion to these four doctors that caused their alleged identified off-label prescriptions. For two other providers named in the amended complaint, Drs. Pincus (*id.* ¶¶ 188-91) and Eisenberg (*id.* ¶¶ 214-17), Carpenter makes no allegation that Abbott even called on them.

Carpenter also alleges that Abbott marketed Kaletra off-label to "other doctors and health care providers nationwide" through the "methods" described in the amended complaint. *Id.* ¶¶ 178-79. Carpenter bases this allegation, however, only upon his *belief* that Abbott's "off-label marketing campaign extended beyond Boston and led to many more claims for reimbursement for off-label prescriptions than the representative sample presented" in the amended complaint. *Id.* ¶ 179. Carpenter does not identify the existence of any alleged false claims outside of Massachusetts, or any providers outside of the Boston area, who allegedly submitted any false claims for reimbursement. *Id.* ¶¶ 178-9, 181-217.

### 3.    Kickback Theory

Carpenter's second theory of FCA liability is that Abbott, in various ways, paid unlawful "kickbacks" to induce providers to prescribe Kaletra. *Id.* ¶¶ 5, 132. For example, Carpenter alleges that:

---

[7]    Carpenter alleges that by mid-2008, Abbott was communicating "clear and accurate information regarding the restriction on once-daily Kaletra." *Id.* ¶¶ 106-08.

- Abbott compensated physicians in excess of $1,000 in return for the doctor's attendance at various meetings and conferences in "essentially" or "largely" a passive capacity, including Day at Abbott Park Advisory Board Meetings "throughout 2006" (*id.* ¶ 134) and regional advisory board programs in 13 U.S. cities in the summer of 2006 (*id.* ¶ 147-48).[8]

- Abbott paid high-prescribing doctors of Kaletra financial remuneration for speaking engagements, speaker development and clinical studies. *Id.* ¶ 132.

Carpenter alleges that physicians attended meetings in "essentially" or "largely" a "passive" capacity, but also admits that the physicians actually performed services. *Id.* ¶¶ 134, 136, 140-41, 148, 161, 163. Carpenter does not allege that any of the unnamed physicians referenced in these general allegations who received an alleged kickback submitted any false claims as a result. While identifying dollar amounts in some instances, Carpenter does not allege the particulars of these payments, or that Abbott issued payments for the purpose of getting a false claim paid by the government. *Id.* ¶¶ 132, 136, 141, 143, 148, 153, 158, 161, 163, 168.

**C.    Public Record Information Recognizing the Importance of Off-Label Use in HIV/AIDS Treatment**

When evaluating a motion to dismiss, the Court may look to "documents the authenticity of which are not disputed by the parties." *Rost II*, 253 F.R.D. at 15 (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). Further, the Court may take judicial notice of published studies and other relevant authorities for purposes of a motion to dismiss. *See In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 15-16 (1st Cir. 2003); *Automated Salvage v. Wheelabrator Envtl. Sys.,* 155 F.3d 59, 67 (2d Cir. 1998). There is public record information relating to the off-label use of drugs in the treatment of HIV/AIDS, including from documents cited in the amended complaint, that this Court should consider in evaluating the plausibility of Carpenter's claims.

---

[8]    Carpenter admits that the *stated* purpose of the meetings was "to provide medical education to providers," but goes on to assert in a conclusory manner that, "in fact, they were sales and marketing events . . . ." *Id.* ¶ 134.

As Carpenter acknowledges, doctors may lawfully prescribe an FDA-approved drug for off-label uses. Am. Compl. ¶ 33; *see also Buckman Co. v. Plaintiff's Legal Comm.*, 531 U.S. 341, 350 (2001). Indeed, the FDA itself recognizes that off-label uses may form a medically recognized standard of care. *See* 74 Fed. Reg. 1694, 1695 (Jan. 13, 2009).[9] Further, the federal Medicaid program permits states that cover drugs to reimburse claims for off-label uses. *See* 42 U.S.C. § 1396r-8(d)(1)(B)(i).

Of particular significance for this case, off-label prescriptions of HIV/AIDS drugs are "an integral part of the community standard of care to treat AIDS and/or prevent HIV-related opportunistic infections." Massachusetts Legislative Report at 27. DHHS has acknowledged the important role of off-label prescriptions by noting that departmental guidelines for the treatment of HIV/AIDS "may not represent FDA approval or approved labeling for the particular products or indications in question." DHHS Guidelines at 123.[10] For example, DHHS has stated that "[l]opinavir/ritonavir" – Kaletra – "can also be administered once daily to PI-naïve patients," even though this use is outside Kaletra's FDA-approved labeling. DHHS Guidelines at 31. Likewise, the DHHS Guidelines, while stopping short of recommending monotherapy for most

---

[9]    *See* Food and Drug Admin., Guidance for Industry - Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices, http://www.fda.gov/oc/op/goodreprint.html (last visited Oct. 6, 2009). In December 2006, a senior FDA official confirmed that off-label uses is a *positive* force in medicine, and that the FDA recognizes that physicians retain discretion to prescribe a drug off-label:

> Physicians will not be able to always wait for FDA to approve a new label for every one of their patients, and drug companies will not be able to conduct a trial to explore every possible contingency. In the future, personalization of care could mean that we will have much more off-label use of new medicines, guided by the latest literature, at least until our regulatory approaches are able to fully adapt to a different paradigm where treatment is highly specific to individual patients. Yet policy forces are tugging in exactly the opposite direction by placing restrictions on the exchange of some of the most pertinent information.

Scott Gottlieb, Food and Drug Admin. Deputy Comm'r for Med. and Sci. Affairs, Remarks at Windhover's FDA/CMS Summit, Washington, D.C. (Dec. 5, 2006), http://www.fda.gov/newsevents/speeches/ucm051792.htm (last visited Oct. 6, 2009).

patients, recognize and cite the substantial medical literature on monotherapy addressing its safety and effectiveness in certain clinical settings. *Id.* at 47 n.1 (noting that PI monotherapy is "under investigation with mixed results."). At least one court has held that the government must follow the DHHS Guidelines in providing care. *Gates v. Fordice*, No. 4:90-CV-125, 1999 WL 33537206, *3-4 (N.D. Miss. July 19, 1999) ("HIV positive inmates are entitled, at a minimum, to the degree of care outlined in the guidelines….").

## III.    ARGUMENT

When considering a motion to dismiss under Rule 12(b)(6), the Court takes as true all well-pleaded facts in the Complaint and draws all reasonable inferences in a light favorable to the plaintiff. *Coyne v. City of Somerville*, 972 F.2d 440, 442-43 (1st Cir. 1992). However, the "Supreme Court 'recently altered the Rule 12(b)(6) standard in a manner which gives it more heft.'" *Rost II*, 253 F.R.D. at 15 (citing *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008)). Now, to "survive a motion to dismiss, a complaint must allege a 'plausible entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007); *see also Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009). Dismissal for failure to state a claim is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Rost II*, 253 F.R.D. at 15 (citations omitted).

In addition, the heightened pleading requirements of Rule 9(b) apply to FCA claims. *See United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009); *United States ex rel. Poteet v. Lenke*, 604 F. Supp. 2d 313, 324 (D. Mass. 2009). Rule 9(b) requires that "[i]n

---

[10]     The DHHS guidelines were cited by Carpenter throughout his complaint. *See* Am. Compl. ¶¶ 58, 60, 61, 70, 113.

alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The particularity requirement requires Carpenter to set forth "the 'who, what, when, where, and how' of the alleged fraud."  *United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141, 147 (D. Mass. 2000).  "The heightened standard of Rule 9(b) is necessary to give the defendant notice as to the nature of the fraud claims and to protect defendants from the filing of weak fraud claims due to the reputation harms resulting from such accusations."  *Rost II*, 253 F.R.D. at 15.[11]

### A.    Carpenter's Amended Complaint Fails to Allege Violations of the FCA with Particularity

The amended complaint fails in multiple ways to plead FCA violations with the particularity required by Rule 9(b).  This includes failing to plead with particularity (1) how Abbott allegedly caused the submission of false claims, (2) that Abbot made payments to doctors for the purpose of inducing them to submit false claims, (3) what false claims were submitted to the government, and (4) what certification of compliance Abbott supposedly violated by its payments to doctors.  In addition, the amended complaint does not plead violation of the various state false claims acts with particularity.  Each of these grounds for dismissal is addressed below.

---

[11]    Additional grounds for dismissal of the complaint are found in Fed. R. Civ. P. 10(b), which requires that "each claim founded upon a separate transaction or occurrence ... shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth."  Carpenter's complaint incorporates by reference all preceding paragraphs into Count I, and has confusingly pleaded separate claims with unique elements under the FCA and various state statutes within that single count, as well as multiple federal and state health programs.  *See* Am. Compl. ¶ 232.  This "undermines the whole purpose of separating the causes of action into different counts" and violates Fed. R. Civ. P. 10(b).  See *Metropolitan Life Ins. Co. v. Drainville*, No. 07-427, 2009 WL 1209473, at *7 (D. R.I. May 4, 2009); *Dormeyer v. Comerica Bank - Illinois*, No. 96-C-4805, 1997 WL 403697, *3 n.3 (N.D. Ill. July 15, 1997) (dismissing under Rule 12(b)(6), but noting viable alternative grounds for dismissal based on FRCP 10(b)).

### 1.    Carpenter Fails to Plead How Abbott Caused the Submission of False Claims with Particularity

Carpenter fails to plead with particularity how Abbott personnel allegedly caused specific doctors to prescribe Kaletra either off-label or in violation of the Anti-Kickback Statute on specific dates, with the result that specific false claims were submitted for Medicare or Medicaid reimbursement.  "FCA liability does not  attach to violations of federal law or regulations . . . that are independent of any false claim."  *Gagne*, 565 F.3d at 48.  Rather, "the statute attaches liability, not to the underlying fraudulent activity or the government's wrongful payment, but to the claim for payment.  Evidence of an actual false claim is the *sine qua non* of a False Claims Act Violation."  *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 225 (1st Cir. 2004) (citations and internal quotation marks omitted).  Thus, a plaintiff must also allege with particularity how the defendant *caused* the submission of false claims by providers. *United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 46-47 (1st Cir. 2009); *see also United States ex rel. Hess v. Sanofi-Synthelabo, Inc.*, No. 4:05CV570, 2006 WL 1064127, at *6 (E.D. Mo. Apr. 21, 2006) ("Rule 9(b) requires that a complaint allege the who, what, when, where, and how of fraud.").  Relator's numerous "information and belief" allegations also fail to satisfy the specificity requirements of Rule 9(b), because relator fails to specify the grounds on which the belief is based. *In re Pharma. Indus. Average Wholesale Price Litig.*, 538 F. Supp. 2d 367, 385 (D. Mass. 2008) (citing *Karvelas*, 360 F.3d at 226, n.8) (dismissing relator's claim in part for failing to satisfy Rule 9(b)).

Carpenter fails to make any individualized factual allegations regarding when or how Abbott communicated its alleged off-label marketing messages to doctors or whether those off-label prescriptions were then submitted for Medicare or Medicaid reimbursement.  Instead, Carpenter generally alleges that Abbott "targeted" doctors "through the methods described in

Section A above: 'Day at Abbott Park' Advisory Boards, Regional Advisory Boards, Promotional Dinners, etc." *Id.* at ¶ 178. Despite his claims about alleged misstatements and omissions in various Abbott (non-promotional) documents, the amended complaint is devoid of details about how, when, and through whom these communications reached the identified Boston-area providers who purportedly submitted false claims. *See id.* ¶¶ 182-217. Further, there are *no* allegations regarding any false statement made by these doctors or anyone else in connection with the alleged submission of claims for reimbursement. Indeed, because Massachusetts Medicaid requires reimbursement of off-label uses of HIV/AIDS drugs for treatment of HIV/AIDS, no false statement of the kind alleged by Carpenter could even exist under Massachusetts law.

Likewise missing are the requisite particulars about how any payments Abbott made to doctors allegedly violated the Anti-Kickback Statute and induced them to submit prescriptions that were reimbursed by Medicare or Medicaid. Indeed, of the doctors named in the amended complaint, Carpenter makes specific allegations about payments made to only one, Dr. Cal Cohen. *See id.* ¶ 182. But there is no allegation that these payments were wrongful or made for the purpose of inducing Dr. Cohen to prescribe Kaletra. And while Carpenter generally alleges that Dr. Cohen "has been subject to Abbott's off-label promotional efforts" (*id.*), there are no specifics suggesting what these "efforts" involved with respect to Dr. Cohen.

Finally, Carpenter fails to describe in detail any relevant statutes, or related reimbursement regulations, that govern claims funded by "ADAP (AIDS Drug AssistanceProgram), the Ryan White CARE Act and HDAP (HIV Drug Assistance Program in Massachusetts)." *Id.* ¶ 41. Moreover, none of the patients Carpenter identifies in the Complaint

received reimbursement through these programs. Therefore, the entirely generic and conclusory claims related to these programs must be dismissed as unsupported by any well-pled facts.

In sum, Carpenter has not alleged sufficient facts to support the element of causation – that Abbott was the actual and proximate cause of any false claims submitted by third-party providers. It is easy to distinguish cases where FCA violations have been found involve far more detailed allegations of how defendant's conduct caused third-party providers to submit false claims. For example, in *United States ex rel. Piacentile v. Wolk,* No. 93-5773, 1995 WL 20833, at *2-3 (E.D. Pa. Jan.17, 1995), the defendant was alleged to have literally falsified claims by altering Medicare Certificates of Medical Necessity—forms containing a certification that the claims represented the physician's judgment—without a doctor's authorization. In *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 46 (D. Mass. 2001), the company representatives were alleged to have directly influenced providers to submit false claims by, for example, "coach[ing] doctors on how to conceal the off-label nature of the prescriptions." *See also United States ex rel. Poteet v. Lenke*, 604 F. Supp. 2d 313, 324 (D. Mass. 2009) (finding that the complaint fails to state a claim under Rule 9, in part, because the complaint does not allege that gifts to providers *caused* the filing of a false filing with Medicare).

The case law makes clear that a plaintiff "must still connect the allegedly fraudulent statement to a planned claim on the government fisc, must show that the defendant intended the statement would have a material effect on the government's decision to pay a claim, and must plead the facts of the fraud with sufficient particularity to satisfy Rule 9(b)." *Gagne*, 565 F.3d at 46 n.7; *see also Poteet*, 604 F. Supp. 2d at 324 ("the details of the actual presentation of false or fraudulent claims to the government can and must be pled with particularity in order to meet the

requirements of Rule 9(b)").  Because Carpenter's amended complaint fails to do this, it must be dismissed.

### 2.    Carpenter Fails to Plead a Kickback Scheme with Particularity

To base an FCA complaint on a violation of the Anti-Kickback Statute, a plaintiff must allege that a defendant *knowingly and willfully* made payments to providers for the *purpose* of inducing referrals of federal healthcare business.  *See* 42 U.S.C. § 1320a-7b(2)*; In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 12, 18-19 (D. Mass. 2007).  "[T]he elements 'knowingly' and 'willfully' were added to the [Anti-Kickback Statute] in 1980 to reflect congressional concern 'that criminal penalties may be imposed under current law [on] an individual whose conduct, while improper, was inadvertent.'"  *United States v. Jain*, 93 F.3d 436, 440 (8th Cir. 1996) (quoting H.R. Rep. No. 1167, 96th Cong., 2d Sess. 59 (1980), *reprinted in* 1980 U.S.C.CA.N. 5526, 5572).  "'The word willfully means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with a bad purpose either to disobey or disregard the law.'"  *United States v. Lizardo*, 445 F.3d 73, 86 (1st Cir. 2006) (quoting district court's jury instructions).

The amended complaint fails to allege this required mental state.  While identifying the quantum of alleged payments in some instances, Carpenter does not allege the particulars of these payments, such as who at Abbott made them, when the alleged payments were made, or any facts to support that Abbott knowingly and willfully issued payments *for the purpose of getting a false claim paid by the government*.  *See, e.g.,* Am. Compl. ¶¶ 132, 136, 141, 143, 148, 153, 158, 161, 163, 168.  Certainly, Carpenter's subjective and conclusory characterization that the physicians attended meetings in "essentially" or a "largely" passive capacity or did "minimal work" does not satisfy this standard.  *See, e.g., id.*  ¶¶ 136, 140-41, 148, 161, 163.  All Carpenter has asserted, then, is a presumption that a pharmaceutical company like Abbott cannot consult

17

with physician advisors regarding ongoing clinical studies that relate to its consideration of pursuing expanded indications for its products, and to pay them fair market value rates for these *bona fide* services. This clearly is not the law. *See* OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23,731-23,743 at 23,738 (May 5, 2003); *see also* 42 C.F.R. § 1001.952(d) (safe harbor regulation for personal services and management contracts).

With one exception, Carpenter does not allege that any of the identified Boston-area providers who wrote the supposedly tainted prescriptions received *any* remuneration whatsoever from Abbott, let alone improper kickbacks. *See* Am. Compl. ¶¶ 188-217. The sole exception is Dr. Cohen, to whom Abbott allegedly made payments for "local as well as national speaking engagements," carrying out a 20-person study, and attending and working on a slide deck for the World AIDS Conference in Toronto. *Id.* ¶ 182. [12] But pleading a kickback requires more than alleging that Abbott paid Dr. Cohen for various services he actually provided, and that Dr. Cohen also prescribed Kaletra. There is no necessary connection between these two facts, and Carpenter does not allege one.

Even intent elements must be supported by *facts* that support the plausibility of the claims for relief. *See Iqbal*, 129 S. Ct. at 1952. Reciting the elements of a cause of action, supported by "mere conclusory statements," does not suffice. *Iqbal*, 129 S. Ct. at 1949. Because Carpenter has failed to allege facts sufficient to support a finding that Abbott knowingly and willfully paid providers specifically to induce Kaletra prescriptions, his FCA claim must be dismissed to the extent it is based on alleged violations of the Anti-Kickback Statute.

---

[12]    Relator also characterizes these payments to Dr. Cohen as examples of "off-label promotional efforts," yet he states no facts in support of off-label statements that Abbott allegedly made in connection with these payments.

### 3. Carpenter Fails to Allege Claims for Reimbursement of Off-Label Prescriptions with Particularity

The amended complaint also fails to meet the requirements for alleging a false claim for reimbursement under section 3729(a)(1), which requires direct presentment of a claim to the government. An FCA complaint alleging a violation of section 3729(a)(1) must address "the content of the forms or bills submitted [including their 'particular [] certification of compliance with federal regulations,' if at issue], their identification numbers, and the amount of money charged to the federal government." *Karvelas*, 360 F.3d at 225, 233; *see also Gagne*, 565 F.3d at 46 n.7; *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266-67 (9th Cir. 1996); *Poteet*, 604 F. Supp. 2d at 324 n.22. The amended complaint lacks these necessary details, which mandates its dismissal under Rule 9(b) to the extent it charges violation of section 3729(a)(1).

### 4. Carpenter Fails to Allege Claims for Reimbursement Tainted by Kickbacks with Particularity

The Anti-Kickback Statute is a criminal provision that does not itself provide for private party actions. Courts have found, however, that where a Medicare or Medicaid claim is submitted with an express certification that it complies with all applicable laws, and it was in fact induced by a kickback, that this constitutes a false claim actionable under the federal FCA. *See, e.g., United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 381 (5th Cir. 2003). In addition, some courts also have held that, in particular contexts, participation in those programs may constitute an implicit certification and therefore also may be actionable. *See, e.g., Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 530 (10th Cir. 2000); *In re Pharma. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d at, 18; *but see United States ex rel. Carter v. Halliburton Co.*, No.1:08CV1162, 2009 WL 2240331, at *13 (E.D. Va. July 23, 2009) (rejecting implied certification "theory" and noting that the Fourth Circuit has expressed doubt as to whether implied certification liability can exist) (*citing Harrison v. Westinghouse Savannah*

*River Co.*, 176 F.3d 776, 786-87 n.8 (4th Cir. 1999)).  The First Circuit has not ruled on the implied-certification issue.

Regardless, Carpenter cannot proceed with his Anti-Kickback Statute-based claims under either an express or implied certification theory.  Carpenter fails to allege that the providers or pharmacy identified in the amended complaint associated with the allegedly off-label Boston prescriptions made material false certifications of compliance with any state or federal laws or regulations, or that Abbott caused these third-parties to do so.  *See* Am. Compl. ¶¶ 188-217. Carpenter fails to identify any actual claim forms submitted for Medicaid, Medicare, or state reimbursement, linked to a particular provider who received a purported kickback, which would support an allegation of a false certification.  *See United States ex rel. Duxbury v. Ortho Biotech Prods.*, 579 F.3d 13, 29 (1st Cir. 2009).  Moreover, even assuming he could rely on an implied certification theory, Carpenter must, at a minimum, allege facts sufficient to show that participation in the government program was contingent upon an implied certification.  *See, e.g., Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001) ("implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies expressly states the provider must comply in order to be paid").  Thus, Carpenter's failure to "allege with particularity any certification of compliance with federal regulations in order to obtain payments" is fatal to his Anti-Kickback Statute-based claims.  *Karvelas*, 360 F.3d at 225, 233.

### 5.    Carpenter Fails to Allege Claims Under State False Claims Acts with Particularity

The amended complaint alleges violations of 13 different state false claims acts.  *See* Am. Compl., pp. 1-2 (introductory paragraph), ¶¶ 239-328.  "The heightened pleading standard of Rule 9(b) generally applies to state law fraud claims brought in federal court."  *Rost*, 507 F.3d at 731 n.8.  Yet Carpenter has not even attempted to allege with particularity a single, actual false

claim in any jurisdiction other than Massachusetts. Carpenter also fails to allege that Abbott caused these state claims or that the state claims for reimbursement were "false claims" as that term is defined under the various state laws. *See* Am. Compl. ¶¶ 223, 231. It is not sufficient under Rule 9(b) to merely allege that health care providers submitted false claims for reimbursement for Kaletra in these states without alleging any facts regarding the who, what, when, where and why regarding particular claims. Indeed, Carpenter's non-Massachusetts state law claims do not pass muster even under Rule 8's pleading standard, as they are not supported by *any* facts. *See Twombly*, 550 U.S. at 555.

Because Carpenter has failed to allege facts sufficient to show that Abbott engaged in conduct that caused any false claims to be submitted in each of the jurisdictions identified in the Complaint, these claims should be dismissed along with the federal claims. In the alternative, if the Court dismisses Carpenter's federal claims, it should exercise its discretion under 28 U.S.C. § 1367(c)(3) to dismiss the various state law claims, and reject any request that the Court exercise supplemental jurisdiction over these non-federal claims. *United States ex rel. Deering v. Physiotherapy Assoc.*, 601 F. Supp. 2d 368, 379 (D. Mass. 2009) (declining to exercise supplemental jurisdiction over remaining state claim in an FCA suit).

**B.    Carpenter Cannot Allege Medicaid False Claims in Massachusetts as a Matter of Law**

Carpenter alleges that Abbott has violated the Massachusetts False Claims Act, MASS. GEN. LAWS ANN. ch. 12, § 5(B)(1)-(2). *See* Am. Compl. ¶¶ 281-287. All of the alleged Massachusetts Medicaid "false claims" identified by Carpenter were submitted by Massachusetts providers within the Commonwealth of Massachusetts. *See* Am. Compl. ¶¶ 188-91, 204-13. As a matter of law, however, any such claims allegedly reimbursed by the Massachusetts Medicaid program, MassHealth, do not constitute "false claims." As noted above, the federal Medicaid

21

program permits states that cover drugs to reimburse claims for off-label uses. *See* 42 U.S.C. § 1396r-8(d)(1)(B)(i); *United States ex rel. Polansky v. Pfizer, Inc.,* No. 04-cv-704, 2009 WL 1456582, at *9 (E.D.N.Y. May 22, 2009). Massachusetts *requires* insurers to reimburse off-label uses of HIV/AIDS drugs like Kaletra if they are recognized as effective treatments "in the medical literature." Mass. Gen. Laws Ann. ch. 175 §§ 47O, 47P. The MassHealth Drug List, which governs reimbursement under Massachusetts Medicaid program, lists Kaletra among the HIV/AIDS prescription drugs for which it will reimburse without prior authorization and without reference to whether the prescription is for off-label use. *See* MassHealth Drug List at 121.[13] Therefore, Medicaid reimbursement for the Kaletra prescriptions described in the Amended Complaint could never constitute a "false claim" in Massachusetts, because state approval of payments for an off-label use necessarily forecloses any argument that requests for such payments constitute "false claims" that defrauded the government. *See Franklin,* 147 F. Supp. at 45; *see also Rost II,* 253 F.R.D. at 16 ("Defendants have a compelling position that state approval undermines the assertion of a 'false claim.'"). Accordingly, Carpenter's claim based on violations of the Massachusetts False Claims Act, as well as his FCA claims to the extent they are based on Massachusetts Medicaid claims, must be dismissed.[14]

### C.    Carpenter's Claims Are Implausible, Requiring Dismissal of the Complaint

To "survive a motion to dismiss, a complaint must allege a 'plausible entitlement to relief.'" *Rost II*, 253 F.R.D. at 15 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55

---

[13]    http://www.mass.gov/Eeohhs2/docs/masshealth/pharmacy/mh_druglist.pdf.

[14]    Other states on whose behalf Carpenter asserts false claims act violations likewise permit Medicaid reimbursement for off-label prescriptions of Kaletra. *See, e.g.,* Virginia Medicaid Provider Manual *available at* http://websrvr.dmas.virginia.gov/ProviderManuals/ManualChapters/RX/chapterIV_rx.pdf (providing for coverage of legend drugs). However, given the total absence of any allegations regarding specific false claims submitted in violation of those states' laws, Carpenter's claims brought on their behalf must be dismissed under Rule 9(b), regardless of whether or not they reimburse for off-label prescriptions of Kaletra.

(2007). Even if Carpenter could overcome the fatal pleading defects discussed above, his claims are inherently implausible and must be dismissed.

"Plaintiff must plead that *but for* Defendant's allegedly fraudulent misrepresentations the doctors would not have made claims to Medicare for off-label uses …. and that *but for* these allegedly fraudulent misrepresentations Medicare would not have reimbursed the doctors." *Hess*, 2006 WL 1064127, at *7; *see also United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992). The amended complaint provides no basis on which a jury could plausibly conclude that Abbott's conduct was the "but for" cause of the alleged off-label prescriptions of Kaletra at issue here. As detailed above, off-label prescriptions of HIV/AIDS drugs are "an integral part of the community standard of care to treat AIDS and/or prevent HIV-related opportunistic infections." Massachusetts Legislative Report at 27. The U.S. Department of Health and Human Services has acknowledged the important role of off-label prescriptions by noting that departmental guidelines for the treatment of HIV/AIDS "may not represent FDA approval or approved labeling for the particular products or indications in question." DHHS Guidelines at 123. Indeed, "almost half of the drugs used to treat HIV disease are prescribed for off-label indications." Robert J. Buchanan, *Medicaid Managed Care and Coverage of Prescription Medications*, 92 AM. J. PUBLIC HEALTH 1238, 1238-43 (2002). In these circumstances, it is far more likely that any off-label prescriptions of Kaletra resulted from the independent medical judgments of doctors than from Abbott's alleged off-label promotional efforts or payments.

Certainly, the allegations at issue here are readily distinguishable from those found to state an FCA claim in other cases. For example, Carpenter has not alleged that company representatives were instructed to coach doctors on how to conceal the off-label nature of

prescriptions, or that the company provided kickbacks such as tickets to the Olympics. *See Franklin*, 147 F. Supp. 2d at 46. In fact, rather than alleging that Abbott tried to "conceal" its purported scheme, Carpenter alleges that Abbott executed the scheme openly, at numerous well-attended meetings throughout the United States, involving hundreds of doctors. *See* Am. Compl. ¶¶ 132, 134, 148. These allegations require the Court to accept the highly implausible proposition that hundreds of independent physicians were willing co-participants in a scheme to defraud federal health care programs.

Moreover, Carpenter has not even alleged that Abbott paid kickbacks to the providers he identifies who allegedly submitted false claims, as the relator did in *Duxbury*. 579 F.3d at 29-30. There, Duxbury alleged that the defendant provided $25,000 worth of free drugs to two separate healthcare providers so that each could seek reimbursement from Medicare under the false and fraudulent certification that the providers had paid for the product. *Id*. at 30-31. Despite these much more detailed allegations, the First Circuit still found that it was a "close call" as to whether Duxbury's claims satisfied Rule 9(b). *Id*. at 30. Carpenter's allegations do not present such a "close call."[15]

But perhaps the most obvious explanation for the prescriptions cited in the amended complaint – and what makes this supposed FCA case uniquely implausible – is that the FDA approved Kaletra in 2000 as a highly effective medicine to treat the disease-state at issue, HIV/AIDS. This is not a case about a drug approved to treat epilepsy being fraudulently marketed as an anti-anxiety pill, *In re Neurontin Marketing and Sale Practices Litigation*, 244 F.R.D. 89, 99-100 (D. Mass. 2007), or about an adult schizophrenia medication being

---

[15]    This is also not a case about increasing profits by inducing physicians to prescribe larger doses of a drug to thereby increase profits per prescription. *Duxbury*, 579 F.3d at 17. Here, there is no dispute that whether doctors prescribe Kaletra once-daily, or twice-daily, a patient takes four pills per day.

fraudulently marketed as a treatment for children's insomnia, *In re Zyprexa Products Liability Litigation*, 549 F. Supp. 2d 496, 526 (E.D.N.Y. 2008),  where off-label prescriptions might be more plausibly presumed – at least at the pleadings stage – to be linked to a company's alleged off-label marketing.  Here, there is no dispute that doctors prescribed a drug the FDA approved as effective against HIV/AIDS to treat HIV/AIDS.

In light of the highly plausible alternative explanations for the alleged off-label prescriptions at issue, and based on the paucity of factual allegations in the amended complaint, the claim that Abbott's conduct was the "but for" cause of off-label Kaletra prescriptions is not plausible.  *See Iqbal*, 129 S. Ct. at 1951; *Twombly*, 550 U.S. at 567.  This fatal flaw requires dismissal of the amended complaint.[16]

## IV.    CONCLUSION

As set forth above, the amended complaint is woefully insufficient in the particulars required to maintain an action under both the FCA and state false claims acts.   These deficiencies, combined with the fundamental implausibility of Carpenter's claim that Abbott induced doctors to prescribe Kaletra off-label and the fact the Massachusetts Medicaid program reimburses providers for off-label prescriptions of Kaletra, require the dismissal of the amended complaint with prejudice.

---

[16]    Carpenter's amended complaint should be dismissed with prejudice.  More than two years have passed since Carpenter filed his original complaint under seal, which he has already amended once.  Despite the amendment, the amended complaint as a whole remains deficient under Rule 9, which further amendment is unlikely to cure.  The heightened standard of Rule 9(b) is necessary, in part, "to protect defendants from the filing of weak fraud claims due to the reputation harms resulting from such accusations."  *Rost II*, 253 F.R.D. at 15. Carpenter cannot rely on discovery to remedy the deficiencies in several of his allegations and he should not be able to conduct a discovery fishing expedition based on nothing more than assumptions and conclusions.  *See, e.g., Karvelas*, 360 F.3d at 231; *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006); *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 n. 24 (11th Cir. 2002).  Because Carpenter's Amended Complaint is insufficient as a matter of law for the reasons set forth above, and amendment would be futile, it should be dismissed with prejudice.  *See Gagne*, 565 F.3d at 48 (affirming district court's order dismissing relator's claim and denying leave to amend).

Dated: November 13, 2009   Respectfully submitted,

By:  /s/ Thomas J. Frederick    
   James F. Hurst (admitted *pro hac vice*)
   Thomas J. Frederick (admitted *pro hac vice*)
   Kathleen B. Barry (admitted *pro hac vice*)
   WINSTON & STRAWN LLP
   35 West Wacker Drive
   Chicago, Illinois 60601
   (312) 558-5600
   (312) 558-5700 – Fax
   jhurst@winston.com
   tfrederick@winston.com
   kbarry@winston.com

   John W. Moss (admitted *pro hac vice*)
   WINSTON & STRAWN LLP
   1700 K Street N.W.
   Washington, D.C. 20006
   (202) 282-5000
   (202) 282-5100 – Fax
   jwmoss@winston.com

   Peter E. Gelhaar (BBO# 188310)
   Michael S. D'Orsi (BBO# 566960)
   DONNELLY, CONROY & GELHAAR, LLP
   One Beacon Street
   33rd Floor
   Boston, Massachusetts 02108
   617-720-2880
   617-720-3554 – Fax
   peg@dcglaw.com
   msd@dcglaw.com

   *Attorneys for Abbott Laboratories, Inc., incorrectly*
   *named as Abbott Laboratories*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing and paper or electronic copies will be delivered to those indicated as non-registered participants on November 13, 2009.

/s/ Thomas J. Frederick
Thomas J. Frederick