UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-10918-RGS

UNITED STATES and OTHERS ex rel. PATRICK CARPENTER

v.

ABBOTT LABORATORIES, INC.

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

July 16, 2010

STEARNS, D.J.

Qui tam relator Patrick Carpenter brought this suit on behalf of the United States of America, the State of California, the State of Delaware, the District of Columbia, the State of Florida, the State of Illinois, the State of Indiana, the Commonwealth of Massachusetts, the State of Michigan, the State of Nevada, the State of New York, the State of Tennessee, the State of Texas, and the Commonwealth of Virginia against his former employer, Abbott Laboratories, Inc. (Abbott), alleging violations of the federal False Claims Act (FCA), 31 U.S.C. § 3729(a)(1)-(2), and analogous state statutes.[1]  Carpenter alleges that Abbott offered kickbacks and other illegal inducements to encourage doctors to write "off-label" prescriptions[2] for Kaletra, a protease inhibitor manufactured and sold by Abbott.  The cost

---

[1]To date, neither the United States nor any of the relator states have opted to join the lawsuit.

[2]"Off-label use of a drug or device occurs when a physician prescribes a use that is not specifically approved by the FDA.  However, the FDA has never as a general matter prohibited the off-label prescription of drugs.  The FDA also does not prohibit physicians from conducting off-label studies to probe the effectiveness of off-label uses of a drug or medical device so long as the studies are not paid for by the manufacturer.  However . . ., the federal government discourages off-label prescription use by imposing FDA restrictions on the dissemination of information by drug companies about potential off-label therapies

of many of these prescriptions was borne by Medicare and Medicaid. On November 13, 2009, Abbott filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). A hearing was held on January 20, 2010.

BACKGROUND

The facts in the light most favorable to Carpenter as the non-moving party are as follows. Carpenter, a pharmacist by training, was employed by Abbott as a Clinical Science Manager (CSM) from April to November of 2006. As an Abbott employee, Carpenter would "work with the sales representatives on sales calls, work with marketing to develop product strategy, present information to various physicians per Abbott's quota, attend conferences and advisory boards, conduct presentations to groups or at advisory boards, select and develop Investigator Initiated Studies, and entertain physicians" throughout New England. Sec. Am. Compl. ¶ 25. During his employment, Carpenter claims to have been made privy to violations of the FCA by Abbott during a campaign to market Kaletra.

Kaletra is a member of the protease inhibitor class of antiretroviral (ARV) drugs. Protease inhibitors are drugs used to control the human immunodeficiency virus (HIV).[3] HIV progressively destroys the body's ability to fight off opportunistic infections by attacking the cells of the immune system. In its advanced stages, the HIV infection is known as acquired immunodeficiency syndrome or AIDS. Kaletra blocks the ability of HIV to process

---

and by restricting . . . reimburs[ement of] health care providers for off-label uses." United States ex rel. Poteet v. Lenke, 604 F. Supp. 2d 313, 316 n.3 (D. Mass. 2009) (internal citations omitted).

[3]Other members of the class include nucleoside reverse transcriptase inhibitors (NRTI), non-nucleoside reverse transcriptase inhibitors (NNRTI), and entry inhibitors. The groupings are based on the method by which the drug suppresses HIV infections.

the protease enzyme, the key to its ability to replicate.  Kaletra was approved by the Food

and Drug Administration (FDA) in 2000 for use twice daily (BID)[4] by a select number of

HIV/AIDS patients.

Until 2006, Kaletra was the only "preferred" protease inhibitor approved by the

Department of Health and Human Services (HHS) for use in the Highly Active Antiretroviral

Therapy (HAART) treatment regimen.  An HIV/AIDS patient treated under the HAART

protocol was prescribed two NRTIs and/or an NRTI/protease inhibitor combination.  Kaletra

remained the drug of choice under HAART until 2003, when the FDA approved two new

protease inhibitor drugs – Lexiva and Reyataz.  These drugs quickly captured a significant

share of the market because of their greater convenience – once-daily dosage (QD)[5]

instead of twice-daily, no food, water, or refrigeration requirements, and fewer side effects.[6]

In 2006, HHS guidelines were amended to classify Lexiva and Reyataz as "preferred"

protease inhibitors.

In 2005, Abbott developed a QD tablet form of Kaletra that received FDA approval

for some but not all HIV patients.[7]  Unlike the QD dosing approved for Lexiva and Reyataz,

the FDA-approved label for Kaletra warned that "*once-daily administration of Kaletra is not*

---

[4]BID is a medical abbreviation.  It is derived from the Latin phrase *bis in die*, meaning "twice a day."  Stedman's Medical Dictionary 201 (26th ed. 1995).

[5]QD is an abbreviation derived from the Latin phrase *quaque die*, meaning "every day."  Stedman's Medical Dictionary at 1478.

[6]Another competitor drug, Sustiva, had received FDA approval in 2002.  Sec. Am. Compl. ¶ 69.

[7]Abbott had sought approval from the FDA for once-daily dosing of Kaletra for all HIV/AIDS patients.  The FDA gave approval for QD dosing for therapy-naive patients only.

*recommended in therapy-experienced patients.*"  Id. ¶ 76 (emphasis in original).[8]

Carpenter alleges that Abbott undertook a nationwide marketing campaign to encourage the off-label use of Kaletra "to increase sales, revenues and market share." Id. ¶ 81. Carpenter cites two specific off-label uses of Kaletra that were promoted by Abbott: (1) QD dosing for therapy-experienced patients; and (2) "Kaletra as a single-drug treatment regimen (monotherapy) rather than for use in combination with other anti-HIV drugs." Id. ¶ 85.[9]

Although a doctor is free to prescribe drugs for off-label uses, FDA regulations forbid pharmaceutical companies from initiating discussions of such uses with physicians and from marketing a drug for anything other than an FDA-approved use. See Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301, et seq. See also supra note 2.[10]  Despite the FDA

---

[8]QD dosing was not approved for therapy-experienced patients because of concerns raised by clinical studies regarding low "trough concentrations" – the amount of drug measurable in a patient's blood immediately prior to the next scheduled dose.

[9]Monotherapy is not recommended for HIV/AIDS patients.  The drug "cocktail" prescribed by the HAART regimen is intended as a precaution against the virus becoming resistant to any one class of drugs.  Kaletra's FDA-approved label specifically states, "Kaletra is indicated *in combination with* other antiretroviral agents for the treatment of HIV-1 infection." Id. ¶ 82 (emphasis added).

[10]The Food and Drug Administration Modernization Act of 1997 (FDAMA) makes a narrow exception for instances in which doctors on their own initiative seek information regarding off-label uses of a drug.  See 21 U.S.C. § 360aaa-6(a), implemented by 21 C.F.R. §§ 99.101-99.105.  This exception lapsed pursuant to a sunset provision in the FDAMA on September 30, 2006.  However, the FDA continues to recognize the distinction between off-label discussions initiated by physicians and affirmative solicitations of doctors by drug companies.  See FDA, Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices, at n.5 (Jan. 13, 2009), http://www.fda.gov/oc/op/goodreprint.html, citing FDA, Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64,093, 64,099 (Dec. 3, 1997) ("The agency will consider whether information about the . . . company's product . . . is . . . disseminated . .

ban, the Second Amended Complaint alleges that "Abbott managers instructed Relator as well as other Kaletra Clinical Science Managers (CSM's) that they were permitted to initiate discussions regarding off-label uses of Kaletra with physicians and other health care providers."  Sec. Am. Compl. ¶ 86.

Carpenter states that he has personal knowledge of questionable marketing practices used by Abbott to promote the off-label use of Kaletra.   These include the following.

1. Distorting the definition of "therapy-naive" to purposely mislead  doctors into prescribing QD dosing for therapy-experienced patients.  Often, this meant encouraging doctors to assume a patient who had never taken a protease inhibitor drug (PI-naive) was identical to a patient who had never taken any ARV drug (therapy-naive).  Id. ¶ 88-100.

2. Omitting warnings in marketing promotions that Kaletra could only be prescribed in QD dosage for therapy-naive patients.  Id. ¶ 101.

3. Prompting discussion of off-label QD dosing of Kaletra for therapy-experienced patients by asking leading questions of physicians during sales calls.  Id. ¶ 102.

4. Misrepresenting the results of clinical studies and FDA approval in PowerPoint presentations by stating that  Kaletra could be QD dosed for patients in "early HIV treatment" rather than the more explicit and narrow phrasing "therapy-naive."  Id. ¶¶ 103-104.

5. Misleading doctors through PowerPoint presentations into believing that the effectiveness of QD dosage for all patients with regard to the Inhibitory Quotient (IQ)[11] was similar to that of therapy-experienced patients.  Id. ¶ 105.

6. Presenting data from monotherapy studies to doctors during slide presentations, sales calls, and newsletters "to proactively promote Kaletra

_____

. at the behest of the company, other than in response to an unsolicited request . . . .").

[11]IQ is the ratio between a drug's trough level and its half-maximal inhibitory concentration (IC50).  IQ is the main indicator used by physicians for measuring a drug's effectiveness.

monotherapy as safe and effective even though monotherapy is not an FDA-approved indication."[12] Id. ¶¶ 111-131.

Carpenter further alleges personal knowledge of clinical meetings at which Abbott deployed these marketing practices, including the following.

1. "Day at Abbott Park" (DAAP) Advisory Boards – six meetings hosted by Abbott at its headquarters in Chicago during 2006 with approximately twenty to forty doctors in attendance at each.  Id. ¶¶ 134-140.

2. Regional Advisory Boards (RAB) – thirty-four seminars in 2006 held nationwide with approximately twenty-five to forty doctors in attendance at each.  Id. ¶¶ 141-157.

3. Promotional Dinners – an unspecified number of dinners, one of which occurred in Boston on July 13, 2006, at which Abbott delivered promotional presentations to approximately thirty doctors at each.  Id. ¶¶ 158-160.

4. Conferences – sponsorship of twenty and sixteen doctors, respectively, to attend the XVI International Aids Conference (IAC) in Toronto in August of 2006, and the 13th Conference on Retroviruses and Opportunistic Infections (CROI) in Denver on February 5-8, 2006.  Additionally, Abbott sponsored a series of post-CROI National Advisory Workshops in March of 2006 in eight cities nationwide.  Id. ¶¶ 161-167.

5. Doctors' Office Visits – an unspecified number of sales calls to doctors' offices by sales representatives, occasionally accompanied by a CSM such as Carpenter.  Id. ¶ 168.

6. Continuing Medical Education (CME) Programs – contributing content to a CME entitled "Unresolved Management Issues in HIV" at the University of Chicago in August/September of 2006.  Id. ¶¶ 123, 169-170.

Carpenter also alleges, although without specifying any actual instances, that Abbott paid "kickbacks" to doctors in the form of honoraria, meals, and travel expenses to entice attendance at Abbott-sponsored events promoting the off-label use of Kaletra.

---

[12]The promotion of Kaletra for monotherapy led Carpenter to send a personal e-mail in May of 2006 to senior Abbott managers expressing his concern that FDA regulations were being violated.

The Second Amended Complaint lists prescriptions for eight Boston-area patients for the period January 1, 2006, through March 25, 2007, issued by doctors who had attended Abbott-sponsored seminars and meetings.  Id. ¶¶ 181-217; Opp'n - Ex. A.  The prescriptions indicate off-label QD and monotherapy uses of Kaletra.  The Medicare/Medicaid programs were charged a total of $44,590.55 for these prescriptions. According to Carpenter, these prescriptions from one pharmacy are the tip of a nationwide iceberg.

The off-label marketing campaign is alleged to have continued until the summer of 2008, when Abbott revised its Kaletra presentation slide deck to conform to FDA-approved labeling.  The modified presentation explicitly instructs physicians: "Do Not Administer Once-Daily Kaletra Tablets or Oral Solution in Therapy-Experienced Patients."  Sec. Am. Compl. ¶ 106.  Carpenter's original Complaint was filed on May 15, 2007.

## DISCUSSION

To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007), disavowing Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555 (internal citations and quotations omitted).  See also Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007).  Dismissal for failure to state a claim will be appropriate if the pleadings fail to set forth "'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'"  Berner v. Delahanty,

129 F.3d 20, 25 (1st Cir. 1997), quoting <u>Gooley v. Mobil Oil Corp.</u>, 851 F.2d 513, 515 (1st Cir. 1988).  In ruling on a motion to dismiss, the court may look to matters of public record. <u>Boateng v. InterAmerican Univ., Inc.</u>, 210 F.3d 56, 60 (1st Cir. 2000).  The court may also look to documents the authenticity of which are not disputed by the parties, to documents central to the plaintiff's claim, and to documents referenced in the complaint.  <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993).  "[T]he discovery process is not available where, at the complaint stage, a plaintiff has nothing more than unlikely speculation.  While this may mean that a civil plaintiff must do more detective work in advance, the reason is to protect society from the costs of highly unpromising litigation." <u>DM Research, Inc. v. Coll. of Am. Pathologists</u>, 170 F.3d 53, 56 (1st Cir. 1999).

I.     <u>Pleading Elements of Section 3729(a)</u>

Carpenter's federal FCA claims are based on 31 U.S.C. § 3729(a)(1) and (a)(2), as the statute appeared prior to its amendment by Congress in 2009.[13]  Subsection (a)(1) prohibits the knowing presentment of a false claim for payment to the government, or (as alleged here) causing such a presentment.  By contrast, subsection (a)(2) prohibits the

---

[13]The prior FCA section 3729(a) read as follows:

(a) Liability for certain acts – Any person who –

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . .

31 U.S.C. § 3729(a)(1)-(2).

creation or use of false records and statements as part of a scheme to persuade the government to pay a false claim. While subsection (a)(1) requires an actual presentment, subsection (a)(2) is satisfied by the mere attempt to cause a false presentment to be made.

After Carpenter's original Complaint was filed (in May of 2007), the FCA was significantly overhauled by the passage of the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21, 123 Stat. 1617 (2009). FERA came as a response to the Supreme Court's decision in <u>Allison Engine Co. v. United States ex rel. Sanders</u>, 553 U.S. 662, 128 S. Ct. 2123 (2008).[14] Neither party disputes that subsection (a)(1) as it appeared prior to 2009 applies to the conduct alleged in Carpenter's Complaint, as the revised statute did not take effect until May 20, 2009. <u>See</u> FERA, § 4(f), 123 Stat. at 1625. However, a retroactivity provision in FERA gives rise to a dispute over whether subsection (a)(2) in its pre-2009 form, or in its modified form under FERA, applies to Carpenter's Complaint.

In <u>Allison Engine</u>, the Supreme Court imposed a specific intent requirement on suits

---

[14]Under the revised FCA, subsections (a)(1) and (a)(2) were amended and renumbered as subsections 3729(a)(1)(A) and (a)(1)(B), respectively. The revised subsection (a) reads:

(a) Liability for certain acts. –

    (1) In general. – Subject to paragraph (2), any person who –

        (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

        (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . .

31 U.S.C. § 3729(a)(1)(A)-(B).

brought under subsection (a)(2).  128 S. Ct. at 2128.  Carpenter, however, does not plead this element.  He alleges only that Abbott "knowingly" violated subsection (a)(2).  Sec. Am. Compl. ¶ 234.  This is not a scrivener's error; it is a deliberate choice on Carpenter's part. He argues that <u>Allison Engine</u>'s interpretation of subsection (a)(2) has been effectively superceded by FERA.  In enacting FERA, Congress amended the FCA to eliminate any suggestion that a violation of subsection (a)(2) required a showing of specific intent.  <u>See</u> FERA, § 4(a)(1), 123 Stat. at 1621; S. Rep. No. 111-10, at 9 (2009).  Under FERA, a relator need only plead (and prove) a "knowing" state of mind (as opposed to a "specific intent to defraud").  The instant dispute concerns the implementing language of FERA.

> The amendments made by this section shall take effect on the date of enactment of the Act and shall apply to conduct on or after the date of enactment, except that – (1) subparagraph B of section 3729(a)(1) of title 31, United States Code, as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all *claims* under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date . . . .

FERA, § 4(f)(1), 123 Stat. at 1625 (emphasis added).

While FERA's language establishing its effective date appears dispositive, Carpenter and Abbott disagree over the meaning of the word "claims."  Abbott argues that "claims" means actual claims for reimbursement presented to the government.  Carpenter contends that "claims" refers to the causes of action advanced in FCA lawsuits.  The point is important because no claims for reimbursement are alleged by Carpenter to have been pending on June 7, 2008.  The only "claims" pending were the legal claims set out in this lawsuit.  While Carpenter's reading of the implementing language is not implausible, subsequent case law has almost uniformly interpreted "claims" to mean claims for reimbursement.  <u>See, e.g.</u>, <u>Hopper v. Solvay Pharms., Inc.</u>, 588 F.3d 1318, 1327 n.3 (11th

Cir. 2009); United States ex rel. Burroughs v. Cent. Ark. Dev. Council, 2010 WL 1542532, at *2-3 (E.D. Ark. Apr. 19, 2010); United States ex rel. Gonzalez v. Fresenius Med. Care N. Am., 2010 WL 1645971, at *9 (W.D. Tex. Mar. 31, 2010); United States v. Chubb Inst., 2010 WL 1076228, at *4 n.10 (D.N.J. Mar. 22, 2010); United States ex rel. Baker v. Cmty. Health Sys., Inc., 2010 WL 1740624, at *16-17 (D.N.M. Mar. 19, 2010); United States ex rel. Putnam v. E. Idaho Reg'l Med. Ctr., 2010 WL 910751, at *4 (D. Idaho Mar. 10, 2010); Mason v. Medline Indus., Inc., 2010 WL 653542, at *3 (N.D. Ill. Feb. 18, 2010); United States ex rel. Parato v. Unadilla Health Care Ctr., Inc., 2010 WL 146877, at *4 n.4 (M.D. Ga. Jan. 11, 2010); United States ex rel. Sanders v. Allison Engine Co., 667 F. Supp. 2d 747, 751-752 (S.D. Ohio 2009); United States v. Sci. Applications Int'l Corp., 653 F. Supp. 2d 87, 106-107 (D.D.C. 2009).  See also United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 30 (1st Cir. 2009) (applying the Allison Engine intent requirement post-FERA to claims for reimbursement filed in 1992-1998).  The court sees no persuasive reason to part company with these cases.  As Carpenter has not alleged a specific intent by Abbott to defraud the government, his subsection (a)(2) claims fail and will be dismissed. See Hopper, 588 F.3d at 1327.[15]

---

[15]Three themes recur in the cases interpreting FERA's retroactivity provision: (1) the plain language of the revised FCA defines "claims" as claims for reimbursement at 31 U.S.C. § 3729(b)(2)(A); (2) the legislative history of FERA consistently uses the term "claims" when referring to claims for reimbursement and "cases" when referring to FCA lawsuits in the explanatory Senate Report (S. Rep. No. 111-10); and (3) the text of FERA demonstrates that the definition of "claims" was limited to reimbursement claims because of a retroactive provision in the very next section, 4(f)(2), which states that the amendment "shall apply to *cases* pending on the date of enactment." (Emphasis added).  While other courts in this district have described a "split" on this issue, United States ex rel. Crennen v. Dell Mktg. L.P., 2010 WL 1713633, at *6 (D. Mass. Apr. 27, 2010), the cases which have held the opposite (that "claims" means FCA lawsuits) contain no analysis that refutes the well-reasoned views of the majority.  Compare United States ex rel. Kirk v. Schindler

The fate of Carpenter's analogous state law claims is hardly more sanguine. The Supreme Court's discussion in <u>Allison Engine</u> was limited to the federal law, and the subsequent cases that have addressed the retroactivity of FERA have not (with the exception of <u>Hopper</u>) asserted state FCA claims. <u>Hopper</u>, however, did not reach the <u>Allison Engine</u> issue in a state-law context because the district court had declined to exercise supplemental jurisdiction. I see no convincing reason why state false claims statutes modeled on the federal FCA would be interpreted any differently by the state Supreme Courts. Because Carpenter has chosen not to plead the element of specific intent in his state "attempted" false claims counts (all of which predate June 7, 2008), they also fail.

II.     The Subsection (a)(1) Claims

Unlike subsection (a)(2), subsection (a)(1) has never been interpreted to incorporate an element of specific intent. (The Supreme Court in <u>Allison Engine</u> did not discuss subsection (a)(1)). Moreover, the pre-FERA language of the FCA makes it explicit that the more lenient "knowing" standard applies. 31 U.S.C. § 3729(b)(3) ("[N]o proof of specific intent to defraud is required.").

Under subsection (a)(1),[16] "[t]he FCA imposes liability upon persons who 1) present or cause to be presented to the United States government, a claim for approval or payment, where 2) that claim is false or fraudulent, and 3) the action was undertaken

---

Elevator Corp., 601 F.3d 94, 113 (2d Cir. 2010); <u>United States ex rel. Westrick v. Second Chance Body Armor, Inc.</u>, 685 F. Supp. 2d 129, 140 (D.D.C. 2010); <u>United States ex rel. Stephens v. Tissue Sci. Labs.</u>, 664 F. Supp. 2d 1310, 1315 n.2 (N.D. Ga. 2009).

[16]The FERA Amendments did not alter the substance of subsection (a)(1) insofar as relevant to this discussion.

'knowingly,' in other words, with actual knowledge of the falsity of the information contained in the claim, or in deliberate ignorance or reckless disregard of the truth or falsity of that information." United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225 (1st Cir. 2004), citing 31 U.S.C. § 3729(a)(1), (b). "'FCA liability does not attach to violations of federal law or regulations . . . that are independent of any false claim.'" Gagne v. City of Worcester, 565 F.3d 40, 48 (1st Cir. 2009), quoting United States ex rel. Rost v. Pfizer, Inc. (Rost II), 507 F.3d 720, 727 (1st Cir. 2007). "[Subsection (a)(1) of] the statute attaches liability not to the underlying fraudulent activity or the government's wrongful payment, but to the claim for payment. Evidence of an actual false claim is the *sine qua non* of a False Claims Act Violation [under subsection (a)(1)]." Karvelas, 360 F.3d at 225 (internal quotations omitted), modified by Gagne, 565 F.3d at 46 n.7. See also 31 U.S.C. § 3729(c). Where a defendant is alleged to have "caused" a third party to submit a false claim, there must be a predicate showing of a "connecting causal link." Rost II, 507 F.3d at 732 & n.9.

III.   Fed. R. Civ. P. 9(b)

Although the failure to plead specific intent does not impugn Carpenter's claims under subsection (a)(1), Abbot argues that they do not survive independent scrutiny under Rule 9(b).[17] It is settled law that the strict pleading requirements of Rule 9(b) apply to an FCA qui tam action.[18] Karvelas, 360 F.3d at 228. Moreover, a relator may not circumvent

---

[17]"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

[18]Although Carpenter alleges violations of thirteen state FCA statutes, it is unnecessary to separately analyze the claims as each of the state statutes contains

Rule 9(b) with the promise that discovery will eventually fill in the missing gaps.  Id. at 231.

Abbott makes five arguments as to why Carpenter's Second Amended Complaint fails to meet the particularity requirements of Fed. R. Civ. P. 9(b):  (1) it fails to plead the alleged kickback scheme with sufficient particularity; (2) it fails to identify any means by which Abbott "caused" the submission of false claims; (3) it fails to allege the details of any claims for reimbursement with particularity; (4) it fails to allege the details of any third-party false certifications; and (5) it fails to give any of the particulars of an alleged "nationwide" scheme.[19]

    a.    <u>The Kickback Scheme</u>

Carpenter wraps the Anti-Kickback Statute (AKS)[20] into a more general allegation that, "[d]octors who received financial remuneration from Abbott, attended a Kaletra

---

identical elements.  "The heightened pleading standard of Rule 9(b) generally applies to state law fraud claims brought in federal court."  <u>Rost II</u>, 507 F.3d at 731 n.8.

[19]Although Abbott makes essentially the same arguments with respect to subsections (a)(1) and (a)(2), in light of the conclusion in Part I of this opinion that the (a)(2) claims fail because of a pleading defect, the court will confine its discussion to the remaining (a)(1) claims.

[20]"[W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

    (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . . "

42 U.S.C. § 1320a-7b(b)(2).

promotional event, or conducted a Kaletra clinical study did in fact write off-label prescriptions for Kaletra." Sec. Am. Compl. ¶¶ 39-40, 133.  More specifically, Carpenter claims that "[d]efendant has offered or paid kickbacks to doctors and other health care professionals to induce them to prescribe or recommend Kaletra in violation of the law." Id. ¶ 235.  Abbott's Rule 9(b) challenge to this allegation is based on the "knowing and willful" element of the AKS, 42 U.S.C. § 1320a-7b(b)(2): "Carpenter does not allege the particulars of these payments, such as who at Abbott made them, when the alleged payments were made, or any facts to support that Abbott knowingly and willfully issued payments *for the purpose of getting a false claim paid by the government.*"  Def.'s Mem. at 17 (emphasis in original).

Carpenter responds that in an FCA context, courts in this district have accepted conclusory allegations of kickbacks as sufficient to survive a Rule 9(b) motion to dismiss. This suggestion is not, however, corroborated by the underlying facts of the cases Carpenter cites.  See In re Pharm. Indus. Average Wholesale Price Litig. (In re Pharm. II), 538 F. Supp. 2d 367, 391 (D. Mass. 2008) (particularity sufficiently pled where the complaint named the sales representative, the date of his or her visit, the name of the hospital recipient, and the specific discount terms offered to the hospital in exchange for ending its purchases of a competing drug); In re Pharm. Indus. Average Wholesale Price Litig. (In re Pharm. I), 478 F. Supp. 2d 164, 172 (D. Mass. 2007) (inflated drug price scheme between pharmaceutical companies and doctors sufficiently pled for Rule 9(b) purposes where the complaint listed the specific drugs sold, their price, and the precise dollar amounts of the associated kickbacks).  In contrast to In re Pharm. I and In re Pharm. II, and other pertinent cases, Carpenter does not allege that money was paid directly to

15

doctors to promote off-label uses (Rost III, infra), or that  lavish trips to exotic locales were furnished to doctors as an inducement (Poteet).  Nor does Carpenter offer any particulars as to names, dates, amounts, or the incentives doctors are alleged to have been offered. He points only to the offering of generic research grants and consulting contracts that fall within the safe harbor regulations of the AKS.  See 42 C.F.R. § 1001.952(d).

     b.   Causation

Abbott next argues that "Carpenter has not alleged sufficient facts to support the element of causation – that Abbott was the actual and proximate cause of any false claims submitted by third-party providers."  Def.'s Mem. at 16.  Causation is not a stringently enforced FCA element.  When at the initial pleading stage a relator has made specific allegations of an off-label marketing scheme that includes kickbacks and claims for reimbursement, but is unable to link them seamlessly together, a rigid showing of causation is not a ticket to discovery.

> Whether there are facts which support Plaintiff's position that Defendants paid unlawful financial incentives *to cause* the prescription [of off-label drugs] . . . is a challenge more appropriate for summary judgment.  It is true that Plaintiff has not alleged that any improper financial incentives were paid to any of the doctors in Indiana who made the prescriptions.  However, that information is not within Plaintiff's possession.

United States ex rel. Rost v. Pfizer, Inc. (Rost III), 253 F.R.D. 11, 17 (D. Mass. 2008) (emphasis added).  See also United States ex rel. Franklin v. Parke-Davis (Parke-Davis I), 147 F. Supp. 2d 39, 49 (D. Mass. 2001) ("Although the Relator here does not identify specific prescriptions for Medicaid patients for off-label uses made by doctors in reliance on the fraudulent representations, [Relator] does not reasonably have pre-discovery access to that patient-specific information.").

In the Second Amended Complaint, Carpenter has alleged some specifics of the alleged off-label marketing scheme.  He has also identified claims for Medicare and Medicaid reimbursement submitted on behalf of eight Boston AIDS patients who were apparently prescribed Kaletra for off-label uses.  However, he has not alleged any connection between kickbacks and the specified prescriptions.  In Rost III, the relator's claims survived a motion to dismiss where the complaint listed the names of Florida doctors who had received cash payments directly from pharmaceutical sales managers in exchange for prescribing off-label uses.  253 F.R.D. at 13.  Nothing as informative is alleged here.  Carpenter states without elaboration that doctors would receive honoraria in amounts ($1,500 - $2,000) that were not commensurate with the work they performed (monthly "critiques" of Abbott's promotional presentations).  Compare Parke-Davis I, 147 F. Supp. 2d at 46 (sham work compensation combined with luxury travel kickbacks).  In the absence of any unsavory details, the court is again left with conduct by Abbott that falls within the AKS safe harbor provisions.

As a second possible exception, Carpenter argues that Rule 9(b) causation can be satisfied by providing "factual or statistical evidence to strengthen the inference of fraud beyond possibility" without providing the details as to each false claim.  See Rost II, 507 F.3d at 733.  Carpenter alleges that based on his observations while working at a Boston pharmacy, "66% (approximately) of the Kaletra once-daily prescriptions were for off-label indications because they [had] been written for therapy-experienced patients." Sec. Am. Compl. ¶ 173.  In Rost II, the First Circuit found statistical evidence sufficient where off-label prescriptions of a given drug were shown to comprise over 50 percent of the sales to adults and 25 percent of all sales to children.  "[I]t is a possible but not a necessary or even

17

strong inference that doctors, persuaded by [a drug company's] financial and other incentives to prescribe [a drug] for off-label uses, have written such prescriptions . . . ." 507 F.3d at 732. Here, however, Carpenter's allegations are not based on a true statistical sample, but on a "guesstimate" derived from anecdotal experience. See Federal Judicial Center, Reference Manual on Scientific Evidence 90-91 (2d ed. 2000) ("[A]necdotal reports can provide some information, but they are more useful as a stimulus for further inquiry than as a basis for establishing association.").

As neither of the potential exceptions apply, a direct showing of causation is required. Because the FCA does not contain its own definition of causation, courts look to common-law tort concepts. These posit separate "substantial factor" and "foreseeability" tests. United States ex rel. Franklin v. Parke-Davis (Parke-Davis II), 2003 WL 22048255, at *4 (D. Mass. Aug. 22, 2003). Accepting the proposition that a misleading promotion of the uses of a drug might foreseeably lead doctors to prescribe the drug for such uses, the relevant issue is whether Abbott's conduct (as alleged) could have played a substantial role in causing the presentment of reimbursement claims to the government. In all but one instance involving the "representative" sample of off-label prescriptions, Carpenter fails to allege that the doctor who wrote the prescription attended an Abbott promotional event or received anything of value as a result.[21] Carpenter simply relies on surveys taken by

---

[21]Most of the doctors are alleged to have been visited by Abbott sales representatives, but Carpenter fails to supply any supporting details, such as the dates of the visits, the messages communicated, and any inducements offered by Abbott. Only Dr. Calvin Cohen, the Research Director at Harvard Vanguard Medical Associates (who is a respected AIDS investigator), is alleged to have received remuneration for attending promotional meetings, and to have subsequently prescribed Kaletra for off-label use by two of his patients. As a "highly influential Boston AIDS physician" (Opp'n at 14), Dr. Cohen is said to have received $450,000 to conduct a clinical study of Kaletra and $8,000 and

18

Abbott at off-label promotional events in which a majority of the doctors who responded said they had been persuaded to prescribe Kaletra more often on a QD basis.  Sec. Am. Compl. ¶ 176.   "State of mind" evidence has been weighed favorably by courts in substantial factor analyses, Parke-Davis II, 2003 WL 22048255, at *5, but has not been held by itself sufficient to satisfy the causation element.[22]

Perhaps the most plaintiff-friendly treatment of the issue of FCA causation is that in Strom ex rel. United States v. Scios, Inc., 676 F. Supp. 2d 884 (N.D. Cal. 2009).   In the Strom case, a pharmaceutical company was alleged to have promoted outpatient prescriptions for a drug approved by the FDA solely for inpatient use.   As in this case, the drug compendia and peer-reviewed medical literature did not support off-label use of the drug.   The district court in Strom found that the causation requirement of Rule 9(b) had been met by the allegation that "Defendants' marketing activities created the market for the outpatient use of [the drug], and that Defendants encouraged such a use even though they had no credible evidence that [the drug] was effective in that context."   Id. at 891.   The district court further held that "the broader allegations suggest that the only reason *any* doctor prescribed [the drug off-label] was because of Defendants' earlier promotion."   Id. at 894 (emphasis in original).   Finally, the Strom court stated that while it was not "second-

_____

expenses to attend the International AIDS Convention in Toronto, Canada.   Sec. Am. Compl. ¶ 182.   As Abbott  points out, there is no allegation that this compensation did not reflect the fair market value of the research services provided by Dr. Cohen.   See 42 C.F.R. § 1001.952(d) (detailing safe harbor provisions for doctors under consulting/management contracts).   Nor is it alleged that either of these payments was intended to induce Dr. Cohen to prescribe Kaletra off-label.

[22]Although Abbott argues that other factors present stronger reasons for increased interest in QD Kaletra (namely, FDA approval in therapy-naive patients), this raises a dispute of fact beyond the scope of a motion to dismiss.

guessing [the prescribing] doctors' considered medical opinions," id. at 891 n. 2, it believed the complaint had sufficiently alleged that doctors had made erroneous medical judgments because they had been "duped: they were told that certain medical evidence existed, when in fact it did not." Id. at 892.

The gruel is very thin, but Carpenter does allege that an Abbott employee agreed with a questioner at one of the dinners that PI-naive is the same as therapy-naive (Sec. Am. Compl. ¶ 97); that Abbott management instructed CSMs to state that the indications for Lexiva QD and Kaletra QD were "substantially similar"; and that this same misrepresentation was included in marketing slidedecks that falsely mischaracterized the QD restrictions of the two drugs as "identical" (id. ¶ 98). Carpenter further alleges that Abbott mischaracterized or omitted conflicting medical evidence in marketing Kaletra, such as literature warning against the very off-label uses that Abbott was advocating, clinical studies that were halted mid-stream because of the adverse side effects of off-label use, and the rejection of QD dosing applications by the FDA and its European counterparts. Id. ¶¶ 72-78, 107, 109-110, 113-114, 117. While these allegations are less than overwhelming, when mustered as a whole, they are sufficient to pass the substantial factor test.

    c.    <u>Claims for Reimbursement</u>

Abbott cites <u>Karvelas</u>, 360 F.3d at 225, 233, for the proposition that "[a]n FCA complaint alleging a violation of section 3729(a)(1) must address 'the content of the forms or bills submitted [including their 'particular . . . certification of compliance with federal regulations,' if at issue], their identification numbers, and the amount of money charged to the federal government.'" Def.'s Mem. at 19. Although the Second Amended Complaint

does not contain these details, Carpenter argues that <u>Karvelas</u> is inapposite because in that case the defendant submitted reimbursement claims directly to the government. Carpenter argues the court should instead look to the holding in <u>Duxbury</u>, 579 F.3d at 29-30, where third-party inducement was at issue (as it is here) and where Rule 9(b) was held to be satisfied.  <u>See also</u> <u>Karvelas</u>, 360 F.3d at 233 ("These details [contents of the bills] do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint.").

Abbott responds that the holding of <u>Duxbury</u> is narrowly limited to its facts.  <u>See</u> <u>Duxbury</u>, 579 F.3d at 32 ("Although we find that the factual evidence alleged here of the submission of false claims caused by [defendant] at a cross-section of medical providers, is sufficient in this context, we decline to draft a litigation manual full of scenarios of what allegations would be sufficient for purposes of Rule 9(b).") (internal quotations omitted). That said, for each of the claims alleged to have been presented, Carpenter has provided the redacted identity of the patient, a prior drug history to demonstrate why the prescription would have been off-label, the date of the claim, the Medicare or Medicaid program to which the bill was submitted, the location of the submitting pharmacy, the dosage, the dollar amount billed, the initials of the pharmacist who filled the prescription, and the name of the doctor who wrote it.  Sec. Am. Compl. ¶¶ 181-217; Opp'n - Ex. A.  The court agrees with Carpenter that this sample of fifty-five off-label Kaletra prescriptions for eight AIDS patients is sufficient for Rule 9(b) purposes.

   d.   <u>Certifications</u>

Abbott argues that "Carpenter fails to allege that the providers or pharmacy identified in the amended complaint associated with the allegedly off-label Boston prescriptions made

material false certifications of compliance with any state or federal laws or regulations, or

that Abbott caused these third-parties to do so."  Def.'s Mem. at 20.  Because Carpenter

has failed to "allege with particularity any certification of compliance with federal regulations

in order to obtain payments," Abbott argues that the Second Amended Complaint should,

for that reason alone, be dismissed.  Id., citing Karvelas, 360 F.3d at 225, 233.  Carpenter

concedes that the Second Amended Complaint does not specifically plead either express

or implied certification, but argues that he is not required to do so to survive a motion to

dismiss.  Carpenter contends that "[a]s a matter of law, all claims to Medicare include

express certifications of compliance with federal health care laws.  Likewise, claims to

Medicaid and other government health care programs impliedly certify compliance with the

AKS."  Opp'n at 21.

Abbott's reliance on Karvelas as imposing a mandatory certification regime on FCA

claims is misplaced.  In Karvelas, the First Circuit cited the lack of certification in noting the

absence of any specifics in a relator's allegations of hospital-wide schemes to defraud the

government.  The failure to "allege with particularity any certification of compliance with

federal regulations in order to obtain payments" was simply one item on a laundry list of

allegations for which the relator had given no details.  Karvelas, 360 F.3d at 233.  Nowhere

in the opinion did the Court hold that evidence of certifications was essential to satisfy Rule

9(b).  See id.

Carpenter's claims also survive under an implied certification theory.  "'Implied

certification' amounts to nothing more than an alternative expression of the well-accepted

idea that billing the government for something not delivered may constitute a false claim.

If the government defines its bargain in a manner that requires adherence to a statute or

regulation, compliance with that statute or regulation is implied by virtue of a request for payment." United States ex rel. Willard v. Humana Health Plan of Texas, Inc., 336 F.3d 375, 382 (5th Cir. 2003), quoting United States ex rel. Willard v. Humana Health Plan of Texas, Inc., No. G-99-0318, at 11-12 (S.D. Tex. Dec. 28, 2001).  "[A] medical provider should be found to have implicitly certified compliance with a particular rule as a condition of reimbursement in limited circumstances.  Specifically, implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid." Mikes v. Straus, 274 F.3d 687, 700 (2d Cir. 2001) (emphasis in original).

Medicaid and Medicare, the two government programs at issue here, have statutory requirements governing payment.  The court in Parke-Davis I explained the reimbursement system under Medicaid for prescribed drugs.

> Whether a drug is FDA-approved for a particular use will largely determine whether a prescription for that use of the drug will be reimbursed under the federal Medicaid program.  Reimbursement under Medicaid is, in most circumstances, available only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10).  Covered outpatient drugs do not include drugs that are "used for a medical indication which is not a medically accepted indication." Id. § 1396r-8(k)(3).  A medically accepted indication, in turn, includes a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is included in specified drug compendia. Id. § 1396r-8(k)(6).  See also id. § 1396r-8(g)(1)(B)(i) (identifying compendia to be consulted).  Thus, unless a particular off-label use for a drug is included in one of the identified drug compendia, a prescription for the off-label use of that drug is not eligible for reimbursement under Medicaid.

147 F. Supp. 2d at 44-45.  Medicare outpatient prescription drug benefits have the same "medically accepted indication" requirement.  See 42 U.S.C. § 1395w-102(e).  Here, there was no medically accepted indication for QD Kaletra in therapy-experienced patients or for

monotherapy in any patients, yet Carpenter has pointed to claims submitted for both.[23] This is sufficient to allege implied certification.

     e.   <u>Nationwide Scheme</u>

Abbott argues that Carpenter's failure to allege any specific facts for off-label Kaletra prescriptions in the twelve relator states other than Massachusetts is fatal to those claims under Rules 8 and 9(b), as well as the heightened pleading standard of <u>Twombly</u> and <u>Iqbal</u>. Carpenter counters that his path is well-trodden in the First Circuit and that ample precedent allows suits to proceed on a nationwide basis where specific facts are alleged involving a single representative state. <u>See</u> <u>Duxbury</u>, 579 F.3d at 30 (false claims submitted by eight health care providers in the state of Washington supported an inference of nationwide claims); <u>Rost III</u>, 253 F.R.D. at 15-16 (two hundred claims submitted in the state of Indiana were sufficient to meet Rule 9(b) requirements for the pleading of FCA counts involving eleven other states).

In response, Abbott argues that <u>Duxbury</u> involved only a federal FCA claim and does not stand for the proposition that the submission of false claims in one state is sufficient to support the assertion that false claims must have been submitted in other states. While <u>Rost III</u> involved multiple states' false claims acts, the court limited discovery initially to the state of Indiana to probe the validity of the kickback allegations before considering whether to authorize nationwide discovery. 253 F.R.D. at 17. The court agrees with Carpenter that a nationwide scheme has been sufficiently pled here, but will follow the sensible course of <u>Rost III</u> in its discovery Order.

---

[23]The court does not address Carpenter's implied AKS certification theory because of his failure to plausibly plead a kickback scheme.

IV.    Pre-Authorization Bars Claims as a Matter of Law in Massachusetts

Abbott points to Rost III for the proposition that prior state approvals of reimbursements for an off-label use "undermine[ ] the assertion of a 'false claim.'" 253 F.R.D. at 16.  Abbott asserts that "Massachusetts *requires* insurers to reimburse off-label uses of HIV/AIDS drugs like Kaletra if they are recognized as effective treatments 'in the medical literature.'" Def.'s Mem. at 22 (emphasis in original), citing Mass. Gen. Laws ch. 175, §§ 47O,[24] 47P.[25]  Because Kaletra appears on the MassHealth Drug List[26] as not requiring prior authorization for reimbursement, Abbott contends that it is impossible to submit a false claim in Massachusetts as alleged in the Second Amended Complaint.

Carpenter strongly objects to this argument and Abbott's portrayal of Massachusetts law.  Specifically, Carpenter points to state regulations as declaring that MassHealth "does not pay for any drug prescribed for other than the FDA-approved indications . . . except as

---

[24]"No individual policy of accident and sickness insurance issued or renewed pursuant to section one hundred and eight, which provides coverage for prescription drugs, nor any group blanket policy of accident and sickness insurance issued pursuant to section one hundred and ten which provides coverage for prescription drugs, shall exclude coverage of any such drug for HIV/AIDS treatment on the grounds that the off-label use of the drug has not been approved by the federal food and drug administration for that indication, if such drug is recognized for treatment of such indication in one of the standard reference compendia, or in the medical literature, or by the commissioner under the provisions of section forty-seven P of this chapter."  Mass. Gen. Laws ch. 175, § 47O.

[25]"The commissioner shall establish an eleven member advisory panel to advise the commissioner on whether off-label uses for HIV/AIDS treatment not included in any of the standard reference compendia or in the medical literature are medically appropriate. . . . After consulting with said advisory panel, the commissioner may direct an insurer to make payments required by section forty-seven O of chapter one hundred and seventy-five." Mass. Gen. Laws ch. 175, § 47P.

[26]MassHealth, The MassHealth Drug List 125 (May 3, 2010), http://www.mass.gov/Eeohhs2/docs/masshealth/pharmacy/mh_druglist.pdf.

the MassHealth agency determines to be consistent with current medical evidence." 130 CMR 406.413(C)(4). Carpenter further notes that this remains an unsettled area of the law. See Parke-Davis II, 2003 WL 22048255, at *3 (D. Mass. Aug. 22, 2003) (requesting amicus brief from the government on issue).

The court believes it is unnecessary to address the effect of pre-authorization at this stage of the litigation. Unlike Rost III, where a drug had a recognized off-label use under one of the three compendia relied on by Medicaid and Medicare, Carpenter alleges there was no support in the medical literature for Kaletra's effectiveness off-label for QD in therapy-experienced patients or for monotherapy purposes.

## V.   Leave to Amend the Complaint

Carpenter makes a general request under Fed. R. Civ. P. 15(a)(2) for leave to amend the Second Amended Complaint if all or part of his claims are dismissed. Opp'n at 25 n.22. Rule 15(a)(2) states "[t]he court should freely give leave when justice so requires." "Grounds for denial generally involve undue delay, bad faith, dilatory motive of the requesting party, repeated failure to cure deficiencies, and futility of amendment." Rost II, 507 F.3d at 733-734, citing Foman v. Davis, 371 U.S. 178, 182 (1962). Abbott argues that leave should be denied for a "repeated failure to cure pleading deficiencies" because Carpenter has already twice amended a Complaint that was filed more than two years ago. Reply at 10. The court agrees with Abbott. The original Complaint was filed May 15, 2007, an Amended Complaint was filed August 20, 2009, and a Second Amended Complaint was filed January 13, 2010. "Plaintiffs do not get a fourth chance to try to get it right." Gagne, 565 F.3d at 48.

## ORDER

26

For the foregoing reasons, Abbott's Motion to Dismiss is <u>ALLOWED</u> in part and <u>DENIED</u> in part. The parties will submit a joint proposed discovery schedule within fourteen (14) days of the date of this Order, with discovery initially limited to the submission of claims originating in the Commonwealth of Massachusetts.[27]

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

[27]Abbott also raised in a footnote a separate possible ground for dismissal under Fed. R. Civ. P. 10(b), which requires "each claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth." Def.'s Mem. at 13 n.11. Although Carpenter seems to have clearly failed to meet the requirements of Rule 10(b) by pleading an 88-page complaint with a federal FCA claim and thirteen separate state FCA claims under a single count, dismissal seems an exceptionally harsh response and one unsupported by the two cases cited by Abbott. The court will, however, grant Carpenter leave to amend the Complaint for the limited purpose of separating the causes of action into individually numbered counts. The Amended Complaint must be filed within seven (7) days of the date of this Order.